### NATIONAL LABOR RELATIONS BOARD, Petitioner/Cross–Respondent,

v.

### FERGUSON ELECTRIC COMPANY, INC., Respondent/Cross–Petitioner.

Nos. 00–4056(L), 00–4142(XAP).

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 2000.

Decided Feb. 14, 2001.

Anne Marie Lofaso, Washington, DC (National Labor Relations Board), for Petitioner/Cross–Respondent.

Dion Y. Kohler, Atlanta, GA (Jackson, Lewis, Schnitzler & Krupman), for Respondent/Cross–Petitioner.

International Brotherhood of Electrical Workers, AFL–CIO, Nora H. Leyland, Washington, DC (Sherman, Dunn, Cohen, Leifer & Yellig, P.C.), for Petitioner/Cross–Respondent, amicus curiae.

Associated Builders and Contractors, Inc., Maurice Baskin, Washington, DC (Venable, L.L.P.), for Respondent/Cross–Petitioner, amicus curiae.

Before FEINBERG, CARDAMONE and PARKER, Circuit Judges.

FEINBERG, Circuit Judge:

The National Labor Relations Board (Board) petitions for enforcement of its order of January 19, 2000, reported at 330 NLRB No. 75, requiring Ferguson Electric Company, Inc., (Ferguson) to pay backpay to David Carr, a paid union organizer, in the amount of $25,626, plus interest, as remedy for its previously adjudicated unfair labor practice in refusing to hire Carr in violation of § 8(a)(3) and § 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(3), (1). Ferguson, a contractor that provides electricians to construction jobsites in upstate New York, cross-petitions for review of the Board's order, arguing that Carr's damages were

speculative, that the Board failed to reduce the backpay award by Carr's interim earnings and that Carr failed to mitigate damages.

## I. Background

This case arises out of the union practice of "salting," or sending paid union organizers into non-union workplaces as employees for the purpose of organizing the workplace from the inside.[1] David Carr, a full-time organizer employed by Local 241 of the International Brotherhood of Electrical Workers (IBEW), sought employment as an electrician at Ferguson's jobsite in Kendall, New York, for just this purpose in August 1995. On his application, Carr alerted Ferguson to his status as an IBEW organizer and his intention to organize the jobsite. If he had been hired, Carr would have remained in the employ of IBEW, engaging in organizing activity during the hours he was not working for Ferguson, and would have left his job at Ferguson when IBEW's organizational efforts were no longer served by his employment there. While working at Ferguson, Carr would have continued to receive his union salary and benefits, in addition to his salary at Ferguson. IBEW would not have permitted Carr to work in this manner for any company other than a non-union employer that IBEW was attempting to organize.

Ferguson refused to hire Carr; as a result, IBEW filed unfair labor practice charges against Ferguson alleging that it refused to hire Carr on the basis of his union membership, activities and affiliation. In July 1996, Carr was promoted to

business manager by IBEW; at this time, had he been employed by Ferguson, he would have quit to devote his full efforts to his new IBEW position. Between August 1995, when Ferguson failed to hire him, and July 1996, when he took the IBEW business manager position, Carr was not employed by anyone other than IBEW.

An administrative law judge (ALJ) held that the company violated §§ 8(a)(3) and (1) of the Act in failing to hire Carr[2] and deferred the issues regarding Carr's entitlement to backpay to a supplemental proceeding. Ferguson filed no exceptions to this decision, and the Board accordingly adopted it on September 24, 1996, ordering Ferguson to cease and desist its discrimination and make an offer of employment to Carr. We enforced this order on April 27, 1997.

In the supplemental proceeding regarding damages, Ferguson disputed the General Counsel's calculation of backpay, and the parties jointly filed a motion to transfer the proceeding to the Board. In that motion, the parties agreed that no oral testimony was necessary or desired. Instead, the dispute was submitted to the Board on the record, which included the original ALJ decision finding that Ferguson had committed an unfair labor practice, the September 1996 order of the Board adopting this decision, the April 1997 judgment of this Court enforcing the Board's order, the General Counsel's compliance specification and notice of hearing in regard to backpay, Ferguson's answer, a Stipulation of Facts (Stipulation) and exhibits. On January 19, 2000, the Board issued a supplemental decision and order.

1. "Salting" is a term from the mining industry, referring to an old practice in which mine owners would sprinkle their mines with gold dust to make them appear more valuable to possible investors. Victor J. Van Bourg & Ellyn Moscowitz, *Salting the Mines: The Legal and Political Implications of Placing Paid Union Organizers in the Employer's Workplace,* 16 Hofstra Lab. & Emp. L.J. 1, 5 (1998). The authors explain that unions use this term to describe the enhanced value of a workplace "sprinkled" with union sympathizers. *Id.*

2. Section 8(a)(3) of the Act prohibits an employer from encouraging or discouraging membership in any labor organization by means of discrimination in hiring (or tenure of employment or any other term or condition of employment). 29 U.S.C. § 158(a)(3). Section 8(a)(1) prohibits employers from interfering with, restraining or coercing employees in their rights of self-organization. 29 U.S.C. § 158(a)(1).

The Board held that Carr was entitled to backpay for the August 1995 to July 1996 period in the amount of $25,626, with interest. Member Hurtgen dissented. *Ferguson Elec. Co.*, 330 N.L.R.B. No. 75, 163 L.R.R.M. (BNA) 1081, 2000 WL 85273 (N.L.R.B. Jan. 19, 2000). The Board petitioned for enforcement of this decision, and Ferguson cross-petitioned for review.

In its petition for review, Ferguson argues, as it did before the Board, that (1) the backpay award was based on impermissible speculation as to the duration of Carr's employment, given that Carr would have quit his work at Ferguson when IBEW determined his organizing efforts were no longer useful; (2) Carr's wages as an IBEW employee from August 1995 to July 1996 should be offset against the backpay award; and (3) Carr failed to mitigate his damages after Ferguson refused to hire him, since IBEW would not have permitted him to work as an electrician anywhere except a non-union shop that IBEW was attempting to organize. Amicus briefs have been filed by IBEW and by Associated Builders and Contractors, Inc., a national trade association representing non-union shops.

## II. Discussion

In *NLRB v. Town & Country Electric, Inc.*, 516 U.S. 85, 98, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995), the Supreme Court unanimously held that "salts," or paid union organizers, were "employees" under the Act; thus, the Act presumably protects salts' rights of self-organization and shields them from discrimination based on their union affiliation, as it protects and shields all other employees. See also *NLRB v. Henlopen Mfg. Co.*, 599 F.2d 26, 30, 31 n. 1 (2d Cir.1979) (concluding that a paid union organizer was an employee protected by the Act). *Town & Country* provoked excitement among unions and concern among non-union employers, as it suggested that a powerful new right of access to non-unionized employees might be available to labor unions. See, *e.g.*, Van

Bourg & Moscowitz, *supra* note 1, at 3–4; Michael H. Gottesman, *Union Summer: A Reawakened Interest in the Law of Labor?*, 1996 Sup.Ct. Rev. 285, 306 (1997). The perceived significance of the decision was heightened by earlier Supreme Court decisions that had recognized employers' rights to deny non-employee union organizers access to their property and thus sharply restricted the ability of union organizers to contact employees in the workplace, where they may be most easily found. See *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 541, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992) (holding that the Board may not grant non-employee union organizers access to an employer's property in the absence of "unique obstacles that frustrate[ ] access to ... employees" such as residence of the employees on the employer's property); *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975 (1956) (holding that the Board could not require an employer to allow non-employee union representatives to enter the employer's parking lot).

■ The case at bar is apparently the first to address the question of remedy for those salts who are the targets of discrimination in hiring, an issue not reached in *Town & Country*. While black letter law teaches that where there is a right there is a remedy, "employee" status under the Act does not necessarily mean entitlement to backpay in the face of an unfair labor practice. See *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 894, 905–06, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (holding that illegal alien workers were "employees" under the Act, but that it was inappropriate to impose even a minimal backpay award without regard to the employees' legal availability for work or actual economic losses). Thus, this case presents the question of what level of enforcement the Act provides for paid union organizers' rights of self-organization.

■ Section 10(c) of the Act provides that upon finding that an employer has committed an unfair labor practice, the

Board "shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of" the Act. 29 U.S.C. § 160(c). "The finding of an unfair labor practice and discriminatory discharge [or failure to hire] is presumptive proof that some back pay is owed by the employer." *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 178 (2d Cir.1965). The gross backpay due an employee who has been wrongfully discriminated against "is the amount that will 'restore the situation as nearly as possible, to that which would have obtained but for the illegal discrimination.'" *NLRB v. Coca–Cola Bottling Co.*, 191 F.3d 316, 325 (2d Cir. 1999) (quoting *Sure–Tan*, 467 U.S. at 900, 104 S.Ct. 2803). Such an award also serves to deter employers from engaging in unfair labor practices. *Mastro Plastics*, 354 F.2d at 175. "[I]t is well settled that the General Counsel for the NLRB must establish the gross amount of back pay due, before the burden shifts to the employer to establish facts which would negative the existence of liability . . . or which would mitigate that liability." *NLRB v. Browne*, 890 F.2d 605, 608 (2d Cir.1989) (internal citation and quotation marks omitted).

 The Board has broad discretionary powers to fashion remedies for violations of the Act and is entitled to deference in its choice of remedy as a result of its unique expertise in labor disputes. *Coca–Cola Bottling Co.*, 191 F.3d at 323–24. "In fashioning its remedies under the broad provisions of § 10(c) of the Act, the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Therefore, the Board's choice of remedy "is subject to limited judicial review, and will not be

overturned if it may fairly be said to have as its purpose ends that will effectuate the policies of the Act." *Coca–Cola Bottling Co.*, 191 F.3d at 324 (internal quotation marks omitted). The Board's findings of fact in matters of remedy, as in other contexts, are conclusive for a reviewing court if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e).

*A. Was the backpay award based on speculative damages?*

 A backpay award must be sufficiently tailored to remedy only the actual consequences of an unfair labor practice, and should not address purely speculative damages. *Sure–Tan*, 467 U.S. at 900, 104 S.Ct. 2803. Mere "[u]ncertainty, however, does not render a back pay award speculative, since '[a] back pay award is only an approximation, necessitated by the employer's wrongful conduct.'" *NLRB v. Aeronautical Indus. Dist. Lodge No. 91*, 934 F.2d 1288, 1297 (2d Cir.1991) (quoting *Bagel Bakers Council v. NLRB*, 555 F.2d 304, 305 (2d Cir.1977) (per curiam)). Ferguson asserts that the Board's award of backpay to Carr was improper because Carr's employment with Ferguson would have been for an indefinite period of time, since Carr would have quit his Ferguson job when IBEW's organizing interests were no longer served by his employment. In the absence of record evidence as to how long Carr's employment at Ferguson would have served these interests, Ferguson argues, there is no rational basis for determining the backpay period and the Board's backpay award was based on impermissible speculation.

Ferguson does not quarrel with the Board's conclusion that August 30, 1995, is an appropriate start date for calculating backpay. The parties have also stipulated that Carr would have definitely left Ferguson's employ by July 1, 1996. Thus, Ferguson's argument that the backpay award was speculative addresses the period from August 30, 1995, to July 1, 1996—only ten

months. While Carr might conceivably have left Ferguson before July 1996 because IBEW's organizing interests were no longer served by his employment there, Ferguson's own action in wrongfully refusing to hire Carr because of his union affiliation leaves us without information on this point, since any conclusions as to the likely success or failure of Carr's organizing and the time that such organizing might take would clearly be based on the purest speculation. Thus, the information available to the Board supported its conclusion that Carr would have continued to work at Ferguson until July 1, 1996, and its determination of the gross backpay due Carr was based on substantial evidence.[3]

■ It is appropriate and consistent with the policies underlying the Act to resolve the doubt on the question whether Carr would · have left Ferguson prior to July 1996 against Ferguson—the party that violated the Act. See *Aeronautical Indus.*, 934 F.2d at 1297. "Indeed, '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *Id.* (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). In this context, it is worth remembering that there will never be complete certainty in the calculation of backpay, whether or not the employee suffering discrimination is a union salt, for "[i]f a paid union organizer might quit, leaving a company employer in the lurch, so too might an unpaid organizer, or a worker who has found a better job, or one whose family wants to move elsewhere." *Town & Country*, 516 U.S. at 96, 116 S.Ct. 450. While evidence that an employee, if hired, would have left his or her job may shorten the backpay period, as did evidence of Carr's acceptance of the IBEW

promotion in this case, the mere possibility that an employee *might* have left sooner is insufficient to shorten the period, since that possibility always exists. Nor should Ferguson be heard to complain that such a resolution leaves it open to potentially unlimited backpay awards, since Ferguson itself always had the power to offer the employee the job wrongfully denied, thus ending the backpay period and the need for speculation regarding exactly how long an employee would hold a job. See *Browne*, 890 F.2d at 609–10 (stating that a firm, clear and unconditional offer of reinstatement made in good faith tolls the backpay period). Indeed, these protests seem especially unconvincing in the present case, when the outer limits of the gross backpay period amount to less than one year. The Title VII cases Ferguson cites in support of its argument that Carr's backpay period is too speculative to permit an award are factually inapposite. See, *e.g., Walker v. Ford Motor Co.*, 684 F.2d 1355, 1361–62 (11th Cir.1982) (finding that when employment is at will or otherwise of an indefinite duration, backpay period extends until reinstatement, but that backpay period may be limited when employment is for a fixed term). In sum, we agree with the Board that the backpay award here was not based on speculative damages.

### B. Should Carr's earnings as an organizer have been offset against his backpay award?

■ Ferguson argues that Carr is entitled to no backpay because his salary of $41,184 a year as an IBEW organizer was greater than the wages he would have received as a Ferguson electrician. The former must be offset against the latter as wages from interim employment, Ferguson asserts, in accordance with the general

---

**3.** In its brief to the Board, Ferguson contended the backpay period should not have extended beyond April 2, 1996, the last day Ferguson performed work at the Kendall work site and one day before it transferred its remaining electricians to a new work site.

Ferguson has not raised this contention on its cross-petition for review, and we therefore consider it abandoned. *Cf. Arce v. Walker*, 139 F.3d 329, 337 (2d Cir.1998) (direct appeal from district court).

Board practice of offsetting interim earnings against a backpay award to compensate only actual damages and avoid making an employee who has found other work more than whole. See *Sure–Tan*, 467 U.S. at 900–01, 104 S.Ct. 2803; *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197–98, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The Board rejected this contention, holding that Carr's IBEW wages were wages from secondary employment, akin to moonlighting, and therefore under longstanding Board precedent should not be offset against his backpay award. See, *e.g.*, *U.S. Telefactors Corp.*, 300 N.L.R.B. 720, 722 (1990); *Am. Pac. Concrete Pipe Co.*, 290 N.L.R.B. 623, 627 (1988). The rationale for this "moonlighting exception" is that when an employee who has been discriminated against has a second job that he or she held or would have held in addition to the lost employment, "earnings from such extra effort should operate to the advantage of the backpay claimant and not the employer." *Birch Run Welding & Fabricating, Inc.*, 286 N.L.R.B. 1316, 1318 (1987), *enforced*, No. 88–5456, 860 F.2d 1080, 1988 WL 108178 (6th Cir. Sept.28, 1988) (unpublished table decision).

Ferguson objects to applying the moonlighting exception to Carr. It argues that Carr's full-time position as IBEW organizer cannot be properly characterized as secondary or supplemental employment held outside full working hours, see *Henry Colder Co.*, 186 N.L.R.B. 1088, 1090 (1970), given that the IBEW position was his primary source of income and that his job at Ferguson would in some ways merely have formed a part of his employment with IBEW, as he would have continued to be under IBEW direction and control while working at Ferguson.

The parties' Stipulation provided that if Carr had been hired by Ferguson, he would have engaged in organizing activity during non-working time. It is immaterial that the salary he earned for organizing during this non-working time would have been higher than his hourly wage as a Ferguson electrician. Similarly, whether his job as a union organizer is more precisely characterized as "primary" or "secondary" employment is not controlling; the relevant inquiry is whether the income Carr received during the backpay period is income for work he would have performed in addition to his duties as an electrician, had he been hired by Ferguson. Had he not been unlawfully discriminated against by Ferguson, Carr would have carried out both his duties as an electrician for Ferguson and his duties as an organizer for IBEW, and he would have been paid by Ferguson for the former and by IBEW for the latter. It necessarily follows that to put Carr in the position he would have occupied absent Ferguson's discriminatory refusal to hire him, Ferguson must pay Carr those wages he would have earned as an electrician over and above his salary as an organizer. See generally *Town & Country*, 516 U.S. at 95, 116 S.Ct. 450 ("[U]nion organizing, when done for pay but during *nonwork* hours, would seem equivalent to simple moonlighting, a practice wholly consistent with a company's control over its workers as to their assigned duties."). Therefore, we reject the argument that Carr's earnings as an organizer should have been offset against his backpay award.

## C. Was the backpay award inappropriate because Carr failed to mitigate damages?

The Stipulation provided substantial evidence regarding Carr's likely starting date and ending date, and thus the General Counsel met its burden of establishing the gross amount of backpay due Carr. See *Browne*, 890 F.2d at 608. Nevertheless, Ferguson asserts that Carr is not eligible for backpay because he failed to mitigate his damages by seeking other employment substantially similar to the work Ferguson denied him. The Stipulation upon which the Board based its decision indicates that Carr, as a method of organizing for IBEW, "might seek employment as a craft em-

ployee with a non-union contractor such as Respondent." It also states that "Carr is not permitted by the Union to seek or obtain employment with a non-union contractor such as Respondent unless the Union is seeking to organize the contractor." Finally, the Stipulation notes that Carr was not employed by anyone other than IBEW during the backpay period. The record does not directly address the job search undertaken by Carr, if any, after he was illegally denied employment by Ferguson. Ferguson first asserts that the failure to introduce evidence on this point is fatal to the General Counsel's case.

 It is well settled that backpay is not available to an employee who has suffered a willful loss of earnings. See, e.g., *Mastro Plastics*, 354 F.2d at 175. After the General Counsel has carried its burden of demonstrating the gross amount of backpay due an employee, the burden of proving that an employee has willfully incurred a loss of earnings lies with the employer. *E.g., NLRB v. Thalbo Corp.*, 171 F.3d 102, 112 (2d Cir.1999). Ferguson correctly points out, however, that in *Mastro Plastics*, this court held that while the burden of persuasion on this point lies with the employer, the General Counsel has the burden of producing the discriminated-against employee to testify regarding whether a willful loss of earnings was incurred. *Mastro Plastics*, 354 F.2d at 177. Ferguson argues that since no evidence as to whether Carr willfully incurred a loss of earnings was included in the Stipulation submitted to the Board, the General Counsel has failed to meet this burden of production, and so the backpay award to Carr cannot be sustained.

The *Mastro Plastics* rule relied on by Ferguson addresses the appropriate allocation of burdens in making an employee who has suffered discrimination physically available for cross-examination. As we explained, "Since the Board presumably has some prior contact with available discriminatees when it computes 'net back pay due' for its specification, it is more likely to know their whereabouts at the time of the hearing. We think it fair to require that the Board make them available." *Id.* (internal citation omitted); see also *NLRB v. Consol. Dress Carriers, Inc.*, 693 F.2d 277, 279 (2d Cir.1982) (characterizing the General Counsel's *Mastro Plastics* burden as an "initial obligation to produce the employees to testify"); *NLRB v. Local 138*, 380 F.2d 244, 252 (2d Cir.1967) (stating that the burden imposed on General Counsel in *Mastro Plastics* was "the burden of producing employees to testify on the issue of willful loss of earnings").[4] It is not obvious that the *Mastro Plastics* holding has any relevance in a case such as this, where the parties' joint motion to transfer the proceeding to the Board stated that "no oral testimony [was] necessary or desired by any of the parties" and, as a result, Carr's availability and whereabouts were arguably beside the point.[5] See *Fugazy Cont'l Corp.*, 276 N.L.R.B. 1334, 1334–35 (1985) (holding the *Mastro Plastics* rule inapplicable when the employer specifically asserts that it has no interest in examining employees regarding mitigation of damages and consequently the General Counsel does not call them as witnesses), *enforced*, 817 F.2d 979 (2d Cir. 1987); see also *Domsey Trading Corp.*, 325 N.L.R.B. 429, 431 n. 9 (1998) (holding

---

**4.** In *Heinrich Motors, Inc. v. NLRB*, 403 F.2d 145, 148 (2d Cir.1968), we characterized the General Counsel's burden as that of "going forward with evidence that the employee has not wilfully incurred a loss of earnings," and cited *Mastro Plastics* for the proposition. This broader articulation of the General Counsel's burden was in no way determinative of the outcome in *Heinrich Motors*, and apparently no Second Circuit case has relied on this characterization of the General Coun-

sel's burden in the intervening 33 years. Therefore, we assume that *Heinrich Motors* did not increase the General Counsel's burden of production.

**5.** Indeed, according to the representation of the Board's counsel during oral argument, "Mr. Carr was at the table when [the parties] hammered out the Stipulation."

that the *Mastro Plastics* burden was satisfied when the General Counsel made the employees available to testify but did not actually call them to the stand).[6]

▮▮▮▮ Even more fundamentally, in the proceeding before the Board, Ferguson failed to argue that the General Counsel had not met its burden of production on the issue of mitigation. Instead, Ferguson proceeded solely on the ground that the Stipulation regarding the restrictions on the scope of Carr's job search was sufficient to allow Ferguson to carry its own burden of proof. Although the Board expressly stated in its decision that "[t]he Respondent ... has the burden to *produce* evidence that would mitigate its liability," 330 N.L.R.B. No. 75, at 5 (emphasis added), Ferguson filed no motions for reconsideration, rehearing, or reopening of the record with the Board as a result of this alleged mistake of law. "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); see also *id.* § 160(f) (stating that in the context of a petition for review, the "court shall proceed in the same manner as in the case of an application by the Board [for enforcement] under subsection (e) of this section"). Even when the Board itself raises and decides an issue *sua sponte*, an objection must be filed with the Board to preserve the issue for a reviewing court. *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C.Cir.1999). No "extraordinary cir-

cumstances" excusing Ferguson's failure to urge its objection before the Board have been alleged here. As a result, we believe that we are prevented from considering the issue by the operation of the statute. See, *e.g., Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982).

▮▮▮ Ferguson further argues that the provision in the Stipulation that Carr would seek employment only from those non-union employers targeted by IBEW *alone* establishes that Carr willfully incurred a loss of income by submitting to IBEW's unwarranted narrowing of the scope of his job search. This argument was presented to the Board, and thus, we may review it. See generally 29 U.S.C. § 160(e), (f). As noted above, Ferguson has the ultimate burden of proving that Carr did not undertake reasonable efforts to find other suitable employment. See *Thalbo Corp.*, 171 F.3d at 112.

Ferguson asserts that IBEW's restrictions unreasonably confined Carr's job search to a small number of employers, but the record is silent as to the actual scope of Carr's search or the actual number of employers included in that search. In the absence of evidence as to these points, it would be inappropriate, given Ferguson's burden of proof and the apparent lack of any request by Ferguson to the General Counsel or the Board to produce Carr as a witness, to presume that Carr failed to make reasonable efforts to mitigate damages.[7] Indeed the extra-record

---

6. It is worth noting that the *Mastro Plastics* rule failed to inspire universal adherence or enthusiasm. See *Florence Printing Co. v. NLRB*, 376 F.2d 216, 223 (4th Cir.1967) ("To say that the opponent of one who has the burden of proof, nevertheless, has the burden of producing evidence for his adversary is in reality to shift the burden of proof. This we are unwilling to do in light of overwhelming authority that the burden of proof rests on the employer."); *NLRB v. Mooney Aircraft, Inc.*, 366 F.2d 809, 813 (5th Cir.1966) ("We think that the Board need not produce the testimony of each and every employee.... A better

rule would leave the burden on the employer, who could produce the employees' testimony whenever necessary to dispute the Board's figures, but who certainly would not find it necessary to call every employee involved."); *Steve Aloi Ford*, 190 N.L.R.B. 661, 662 (1971) (refusing to adopt the *Mastro Plastics* rule); but see *NLRB v. Rice Lake Creamery Co.*, 365 F.2d 888, 891–92 (D.C.Cir.1966) (following *Mastro Plastics* ).

7. The Board therefore appropriately held,

[I]f the record before us contained substantial evidence showing that ... the Union's

evidence cited in the IBEW amicus brief (and used by Ferguson in its own reply brief) suggests a large universe of employers was potentially available to Carr even with the union's restrictions on his job search, since, according to IBEW's representations, almost three-quarters of electrical contractors are not unionized. Whether IBEW saw all local non-union electrical contractors as equally attractive targets for unionization or whether it unreasonably restricted Carr's job search to only a few selected non-union employers is simply not discernible from the present record. Ferguson made the choice to forego cross-examination of Carr, instead electing to take the risk that the Stipulation's provision regarding the scope of Carr's search for employment would not alone serve to carry Ferguson's burden of proof. This decision has proven unwise. As the Board properly noted,

> By propounding its bare argument, without supporting facts or evidence, [Ferguson] has failed to satisfy its burden [of proof]. In effect, [Ferguson] asks the Board to establish in "salting" cases a *per se* rule that a failure to mitigate damages will be found in any case in which a union places limitations on the "universe" of employers to whom an organizer may apply for work. We can discern no rational reason for establishing such a rule.

330 N.L.R.B. No. 75, at 5. We agree. As a result of its failure to introduce evidence in support of it argument that Carr did not make reasonable attempts to mitigate damages, Ferguson remains liable to Carr for the entire backpay award.

### III. Conclusion

In summary, we hold that a salt's status as an employee of a union subject to union control in duration of employment does not in and of itself make a backpay award impermissibly specula-

tive. We also hold that a union salt need not offset his or her union earnings against backpay awards when the salt would undertake organizing activities during non-working hours, since these union earnings are analogous to any other moonlighting earnings. Finally, we hold that the existence of some union-imposed restrictions on a salt's search for employment does not compel the conclusion that the salt failed to mitigate damages, absent further evidence on the actual scope of the salt's job search. Our confidence in these holdings is strengthened by the purposes of the Act. As the Supreme Court held over half a century ago,

> Discrimination against union labor in the hiring of [workers] is a dam to self organization at the source of supply. The effect of such discrimination is not confined to the actual denial of employment; it inevitably operates against the whole idea of the legitimacy of organization. In a word, it undermines the principle which ... is recognized as basic to the attainment of industrial peace.

*Phelps Dodge Corp.*, 313 U.S. at 185, 61 S.Ct. 845. Discrimination against organizers' entrance into the workplace serves as an identical dam. Since paid union organizers have been held to be employees under the Act, it is appropriate that their rights as employees be meaningfully enforced and discrimination against them be meaningfully deterred through backpay awards when they are unlawfully kept from entering a workforce. For these reasons, we enforce the Board's order awarding David Carr $25,626, plus interest, and deny Ferguson's petition for review.

---

policies unreasonably limited Carr's job search, or that Carr otherwise unreasonably failed to mitigate damages, such evidence would favor our finding merit in the Re-

spondent's contentions. As we have found, however, the Respondent has made no such showing.
330 N.L.R.B. No. 75, at 6.