RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0208P (6th Cir.)
File Name:  02a0208p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

F.A. WILHELM
CONSTRUCTION CO., INC.,
         *Plaintiff-Appellee/*
            *Cross-Appellant,*

v.

KENTUCKY STATE DISTRICT
COUNCIL OF CARPENTERS,
AFL-CIO,
         *Defendant-Appellant/*
            *Cross-Appellee.*

Nos. 00-6008/6069

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No.  98-00252—John G. Heyburn, II, Chief District Judge.

Argued:  November 30, 2001

Decided and Filed:  June 12, 2002

Before:  MERRITT, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Alton  D.  Priddy,  PRIDDY,  ISENBERG,
MILLER & MEADE, Louisville, Kentucky, for Appellant.

1

James U. Smith, SMITH & SMITH, Louisville, Kentucky, for Appellee. **ON BRIEF:** Alton D. Priddy, PRIDDY, ISENBERG, MILLER & MEADE, Louisville, Kentucky, Thomas J. Schulz, KENTUCKY STATE DISTRICT COUNCIL OF CARPENTERS, Frankfort, Kentucky, for Appellant. James U. Smith, SMITH & SMITH, Louisville, Kentucky, for Appellee.

MERRITT, J., delivered the opinion of the court, in which CLAY, J., joined. GILMAN, J. (pp. 12-14), delivered a separate opinion concurring in part and dissenting in part.

————————————

## OPINION

————————————

MERRITT, Circuit Judge. This is a "secondary boycott" case in which the defendant union challenges the district court's finding of an unlawful secondary boycott and the award of $44,547.76 in damages and the plaintiff, Wilhelm Construction, cross-appeals the court's failure to award it more damages. In a "secondary boycott," a union brings economic pressure to bear on a "primary employer" to do something the union wants -- say, to agree to a union contract -- by inducing a "secondary employer" doing business with the primary employer to bring economic pressure on the primary employer -- say, to stop doing any further business with the employer. Under § 8(b)(4) of the Taft Hartley Act of 1947, a secondary boycott is illegal if the union seeks to persuade secondary employees to boycott the primary employer, but it is not illegal if the secondary employees act purely on their own initiative to boycott the services of the

speculative damages."). Absent evidence that Wilhelm suffered an actual loss as a result of not using the rented equipment during the strike, the award of damages approved by the majority appears to be grounded in speculation and potentially provides Wilhelm with a windfall at the expense of the Union. I therefore disagree with the majority's conclusion that Wilhelm established its right to recover damages based upon the lost use of the rented equipment. On the other hand, I have no quarrel with the authorities relied upon by the majority in awarding Wilhelm damages for the lost use of its own equipment.

In sum, I would affirm the district court's conclusion that the Union violated § 8(b)(4) of the NLRA, but would remand for a revised calculation of damages because of Wilhelm's failure to adequately prove an actual loss resulting from the rented equipment sitting idle during the strike.

primary employer.[1] *Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 366 U.S. 667, 672-73 (1961).

In this case, the union argues that the employees of the secondary employer, Wilhelm Construction, acted on their own initiative against the primary employer, Dant Clayton. We conclude that the district court was correct in its finding of an illegal secondary boycott, but remand the case for an adjustment and recalculation of one element of the damage award.

### I. FACTS

Plaintiff F.A. Wilhelm Construction Company, Inc. brought this action against Defendant Kentucky State District Council of Carpenters, AFL-CIO, a union representing carpenters in the Louisville area. Wilhelm contends that it was injured when the union encouraged an illegal secondary boycott and violated a no-strike clause in the collective bargaining agreement between the parties.

---

[1] Section 8(b)(4) of the National Labor Relations Act, as amended, provides that it shall be an unfair labor practice for a union or its agents:

> to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is --
>
> . . .
>
> forcing or requiring any person . . . to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees . . .: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . .

29 U.S.C. § 158(b)(4)(ii)(B).

In 1997, Wilhelm was a contractor for the construction of the University of Louisville's new stadium. Wilhelm was responsible for constructing a portion of the stadium's concrete superstructure and entered into a collective bargaining agreement with defendant union covering work in the Louisville area, including its portion of the stadium work. The installation of the stadium seating was awarded to Dant Clayton, a local seating manufacturer. Despite defendant union's efforts, Dant would not enter into a collective bargaining agreement with it. Dant subcontracted the installation of the seats to Dailey Seating Company, but defendant union was also unsuccessful in entering into a union contract with Dailey.

On December 4, 1997, defendant told Dailey that there would be a picket line established against it the following morning. Union representatives walked around the project later that day advising all union members, including Wilhelm workers, that picketing would begin against Dailey the following day and requesting volunteers to staff the picket line. The union specifically requested Wilhelm workers to join the picket line. A union wallet card was distributed stating on one side: "GOOD UNION BUILDING TRADESMEN do not work behind banners even with 4 gates." The other side read:

> Which side are you on? Picketing has been described by the Supreme Court as the "working man's means of communication." A picket is a message to you that some of your fellow workers are engaged in a labor dispute and need your help. It is your constitutional right as an American citizen to decide how you will respond to that picket. Under the law your union cannot help you make that decision. You can seek guidance only from your conscience then decide, "Which side am I on?"

In response to the union's activities, the project manager set up a "reserve gate system" and faxed a letter to the union

than a month before the picket line began that stated "GOOD UNION BUILDING TRADESMEN do not work behind banners even with 4 gates," thereby implicitly calling on its members who worked for secondary employers to join any strike that might take place at the construction site. The card also stated that the Union could not advise its members what to do, but any member reading the card would likely interpret its overall effect as "a wink and a nod" to join the strike if and when it was called. Accordingly, I am not left with the "definite and firm conviction" that the district court erred in inferring from these facts that the Union intended to conduct a secondary boycott in violation of § 8(b)(4). *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001) (noting that a factual finding is clearly erroneous only if the reviewing court is "left with the definite and firm conviction that a mistake has been committed").

I am convinced, however, that the district court erred in awarding damages to Wilhelm for the lost use of the equipment that it had rented for the construction project. The majority reaches the opposite conclusion, reasoning that the district court properly awarded Wilhelm a prorated amount of the monthly rental cost of the equipment that sat idle. But Wilhelm never offered proof that it was required to pay a penny more in rental fees because of the strike-induced delay in construction. The record, moreover, provides no support for the majority's assertion that this equipment "likely could have been used on another job site." Maj. Op. at 11. Furthermore, as opposed to its own equipment, Wilhelm neither incurred depreciation costs nor lost potential rental income as a result of the borrowed equipment sitting idle during the six-and-one-half days of the strike.

A damage award must be based upon more than speculation. *See NLRB. v. Ferguson Elec. Co., Inc.*, 242 F.3d 426, 431 (2d Cir. 2001) ("A backpay award must be sufficiently tailored to remedy only the actual consequences of an unfair labor practice, and should not address purely

---

## CONCURRING IN PART, DISSENTING IN PART

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part.  I concur with the majority's holding that the district court did not clearly err in concluding that the Kentucky State District Council of Carpenters, AFL-CIO (the Union) violated § 8(b)(4) of the National Labor Relations Act (NLRA), but write separately to express my view with regard to the proper scope of that holding.  In addition, I respectfully dissent in part from the majority's calculation of the damages owed F.A. Wilhelm Construction Company, Inc. (Wilhelm) because of the Union's § 8(b)(4) violation.

The district court found that the Union intended to conduct a secondary boycott when it asked all of its members, including those employed by Wilhelm, to help staff a picket line set up against two nonunion employers, Dant Clayton Company (Dant) and Dailey Seating Company (Dailey). Because I believe this issue to be a close call, I agree with the majority that the district court's finding is not clearly erroneous.  I write separately, however, to express my concern that the majority's holding on this issue might be construed as creating a per se rule that a labor union necessarily intends to conduct a secondary boycott anytime that it asks its members to assist in staffing a picket line.  In my view, drawing such an inference would not always be justified, as, for example, where a union makes clear that it seeks the assistance of its members who work for secondary employers only when those employees are off-duty.

The Union in the present case, however, did not clarify its intent to limit the picket call to off-duty employees.  It instead made an unconditional request that all of its members help staff the picket line being organized against Dant and Dailey. Moreover, the Union distributed a card to its members less

office at 5:30 p.m. on Thursday, December 4, notifying it that of the three entrance gates to the project, gate number one would be reserved for Dant Clayton employees and their subcontractors, suppliers and visitors.  Because the union offices closed at 5:00 p.m., the union did not receive the letter informing it of the reserve gate system until the morning of Friday, December 5, and employees did not know of the reserve gate system before coming to work that day.

The establishment of a reserve gate system is common in the construction industry, particularly where numerous employers work at a site but only one is experiencing labor unrest.  Under a reserve gate system, one gate, or entrance, called the "primary" gate, is reserved for the exclusive use of the "primary" contractor that is the target of the picket line, as well as its subcontractors, vendors and guests; other gates or entrances are reserved for use by contractors and others not involved in the dispute. Generally, once a reserve gate system is in place, the union must confine its picketing to the primary gate.  The system is designed to keep neutral parties out of the dispute and avoid the need for them to cross picket lines. Reserve gate systems are usually effective because unions confine their picketing to the gate reserved for the targeted contractor and the project is not shut down.

On the morning of December 5, signs were in place at each entrance to the project.  The signs at gates 2 and 2a read: "Stop-Read.  Dant Clayton Company, Its employees, suppliers and visitors are prohibited from using this entrance to this construction project."  The sign at gate 1 read: "Stop-Read. This entrance is reserved exclusively for Dant Clayton Company, Its employees, suppliers or visitors."  The signs did not mention Dailey specifically nor did they mention Dant subcontractors.

Because the signs did not mention Dailey specifically by name, defendant picketed all gates, not just the gate reserved for Dant.  Other union members refused to cross defendant's

picket lines and all work on the project was shut down. Defendant was informed by letter that the reserve gate system would continue on Monday, December 8, and that Dailey's name would be added to the signs by the morning of December 9. Once the signs were changed, the union stopped picketing at gates 2 and 2a, but kept gate observers at the two neutral gates. None of defendant's members returned to work on December 9. On December 10, workers from all other unions except defendant's returned to work. Defendant's members ceased picketing on December 11 after the head of the national carpenters' union wrote a letter to the local union advising that the strike was improperly affecting plaintiff, a union contractor with a no-strike clause.[2] At no time during the strike did defendant encourage its members to return to work.

## II. LIABILITY

Under the Act, when a union has a problem with the "primary" employer, it must focus its activities on that employer only. It may not exert pressure, whether direct or indirect, on other neutral or unrelated "secondary" employers. Encouraging employees to engage in a concerted activity against their employer in order to have that employer refuse to deal with the primary employer is illegal. The question is a factual one as to the union's intent. Accordingly, in determining whether a union has violated § 8(b)(4), the court

---

[2]The letter sent to defendant from the president of the national union said in part:

> You are hereby directed . . . to see that the project is manned immediately under the provisions of the [contract] under which this contractor [Wilhelm] is working. . . .

Letter from Douglas McCarron, General President of the United Brotherhood of Carpenters and Joiners of America to Steve Barger, Secretary of the Kentucky State District Council of Carpenters, Dec. 10, 1997 (Exhibit 36, J.A. at 221).

incurred in renting cranes and other heavy equipment. Specifically, the union argues that there are only two possible ways in which Wilhelm could have incurred additional costs for the use of the crane and heavy equipment: (1) having to pay additional sums because the delay caused it to exceed the stated ceiling or cap on the number of hours that the equipment can be used in one month according to the lease agreement or (2) because the heavy equipment was rented on a monthly, not daily, basis, having to pay for an additional month of rental and only using the equipment for several days.

Wilhelm testified that it calculated the daily rate for the heavy equipment by dividing the monthly fee by the number of working days in the month and submitting a damage amount for an additional six and one-half days. As with the discussion above concerning Wilhelm-owned equipment, rented equipment sitting idle incurs additional costs for Wilhelm. The equipment likely could have been used on another job site. We do not believe the district court erred in awarding damages prorated for six and one-half days of the monthly rental rate.

Accordingly, we affirm the judgment of the district court as to its finding of an unfair labor practice but we reverse the damage award as to Wilhelm's own equipment and remand for recalculation in a manner consistent with this opinion.

Wilhelm submitted numbers using the *daily* rental rate for its equipment, which, in the absence of specific evidence that the equipment could have been rented at the daily rate each day, probably overstates the amount of actual loss. A more reasonable and realistic approach in this situation is to calculate the *monthly* rental rate and prorate it over the actual time Wilhelm was deprived of its use (six and one-half days). Wilhelm should be entitled to some compensation for the unanticipated loss of the opportunity to use the equipment caused by the union's unlawful conduct. We therefore believe that Wilhelm should be awarded damages with respect to the loss of use of its own equipment, both office equipment and construction equipment, for 6.5/22 (six and one-half twenty-seconds)[3] of the applicable monthly rate.

Wilhelm's other arguments regarding damages fail. Its argument that the district court erred by not awarding damages for seven other key personnel was not unreasonable where Wilhelm was unable to name all twelve people for whom it sought expenses. Its ability to name only five of the twelve justified the district court in awarding damages only for those five employees. Wilhelm also contends that the district court used an incorrect number in calculating the cost of renting the steel forms for an additional six and one-half days because it failed to add the 6% sales tax in the amount. Exhibit 34, however, includes the 6% sales tax in the calculation and we can find no error in the district court's math.

In its appeal, the union contends, first, that no secondary boycott occurred and that no damages should be awarded. Alternatively, it complains that if damages are to be awarded, the district court erred in awarding $17,633.07 for costs

---

[3]This fraction was derived by using the district court's finding that the strike lasted 6.5 days out of a 22-day business month, the number used by Wilhelm in other calculations.

must decide if the union's actions were directed at the secondary employer or merely had ancillary consequences for that employer. It is not necessary that the sole object of the strike be focused on the secondary employer if one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary employer. Whether the union was motivated by a secondary objective is a question of fact and is to be determined by the totality of the union's conduct under the circumstances.

The question for the district court, therefore, was one of intent. The district court concluded, and we agree, that representatives of the union violated § 8(b)(4) when they explicitly enlisted advance help from Wilhelm employees to form a picket line against Dailey. The direct solicitation by defendant of Wilhelm's union employees before any picket line had been established demonstrates that defendant's likely objective was to keep Wilhelm employees off the job. A reasonable inference from the evidence demonstrates that defendant intended to embroil Wilhelm in its labor dispute against Daily by recruiting Wilhelm workers to staff the picket lines in advance of the creation of the picket. Because the district court found that the solicitation of Wilhelm employees to establish a picket line constituted an unfair labor practice, it declined to consider whether the no-strike clause of the collective bargaining agreement was breached. In affirming the district court's judgment concerning the secondary boycott, we find it unnecessary to reach the no-strike issue as well.

### III. DAMAGES

Section 303 of the National Labor Relations Act, 29 U.S.C. § 187, provides a private cause of action for damages arising from a violation of § 8(b)(4). The district court awarded Wilhelm $44,547.76 in damages. Both parties appeal the award.

The district court found that the strike lasted six and one-half days and awarded damages for those days to Wilhelm for (1) rental equipment and steel forms; (2) payment of expenses to five "key employees;" (3) increased labor costs in the form of salaries and (4) subcontractor expenses. The district court declined to award damages requested by Wilhelm for loss of use of Wilhelm-owned equipment and key employee expenses for seven additional people. In addition, Wilhelm claims that the court used the wrong number in calculating the rental rate for the steel forms.

Once liability is established, Wilhelm is entitled to recover all damages "directly and proximately" caused from the violations of the Act by the union. *Riverton Coal Co. v. United Mine Workers*, 453 F.2d 1035, 1042 (6th Cir. 1972). Damages awarded under Section 303 need not be capable of precise measurement -- the amount recovered need only be a just and reasonable approximation of the actual injury sustained as a result of the illegal strike and should not be merely speculative. Only actual losses incurred as a result of the strike may be recovered. All that is required is that sufficient facts be introduced for a court to arrive at an intelligent estimate without conjecture. *Taylor Milk Co. v. International Brotherhood of Teamsters*, 248 F.3d 239, 247 (3d Cir. 2001).

Turning to Wilhelm's cross-appeal first, Wilhelm contends that the district court's failure to award any damages for the loss of use of Wilhelm-owned equipment is error. We agree. Damages for lost opportunity revenue may be awarded for loss of use of owned equipment. As other courts have recognized, "idle equipment or equipment that remains on a job site longer than expected because a job is delayed for some reason is a real and quantifiable loss to the contractor whether rent is paid to another or charged to the contractor himself as an accounting expense." *R.L. Coolsaet Const. Co. v. Local 150, Int'l Union of Operating Engineers*, 177 F.3d 648, 660 (7th Cir. 1999). When equipment sits idle, expenses

such as depreciation, finance charges and taxes accumulate without generating offsetting revenue. Keeping equipment on a job site longer than expected without corresponding revenue entails opportunity costs. *Id.* at n.9.

The district court determined that Wilhelm was only entitled to recoup the rental value of its *own* equipment if it could show either that (1) it could have rented the equipment to another company or (2) it had to rent similar equipment at a different site because it could not use its own equipment from the stadium site. Although Wilhelm submitted schedules of daily rental rates for certain equipment during 1997, it failed to put on specific evidence of where it would have used the equipment were it not sitting idle at the stadium site for six and one-half days during the boycott or where it would have used the equipment had it not remained at the stadium site six and one-half days longer than it would have but for the boycott. Contrary to Wilhelm's assertion, the problem was not that the district court did not understand that Wilhelm incurred costs when its equipment sat idle and was not used productively; the problem was the more basic one of Wilhelm's failure to show where it specifically suffered any loss with respect to the rental of its own equipment. The law, however, does not require Wilhelm to show its loss with the specificity required by the district court. In *American Bridge Div., U.S. Steel Corp. v. International Union of Operating Engineers, Local 487*, 772 F.2d 1547, 1553 (11th Cir. 1985), the appeals court simply reduced, but did not eliminate, a damage award for loss of use of owned equipment where there was evidence that American Bridge frequently rented idle equipment to other companies, but there was no evidence to support the assumption that American Bridge could have done so *for the time it sought damages*. In view of the failure of proof, the damage award was reduced. The same situation exists here.

Wilhelm undoubtedly was harmed to some extent by being deprived of the efficient use of its own equipment. However,