Donnie BALES, David T. Donaldson, Jonas C. Gates, Hickman S. Ridley, Jr., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 89–5083.

United States Court of Appeals, Sixth Circuit.

Argued July 26, 1990.

Decided Sept. 11, 1990.

Stephen G. Anderson (argued), Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Knoxville, Tenn., for petitioners.

Aileen A. Armstrong, Deputy Associate General Counsel, Paul Spielberg, Joseph Oertel, Joseph Jablonski, Jr. (argued), N.L.R.B., Office of the General Counsel, Washington, D.C., Martin M. Arlook, Director, N.L.R.B., Region 10, Atlanta, Ga., for respondent.

Wade B. Cowan (argued), Cowan & Cowan, Nashville, Tenn., for Carrier Corp., Carrier Trucking Service (Carrier) intervenor.

Before KENNEDY and MILBURN, Circuit Judges; and WEBER, District Judge.*

KENNEDY, Circuit Judge.

Petitioners Donnie Bales, David T. Donaldson, Jonas C. Gates, and Hickman S. Ridley, Jr. seek review of a Supplemental Decision and Order of the National Labor Relations Board (the Board). The petitioners claim that the Board should have required their former employer, Carrier Corporation, to reinstate them and should not have tolled back pay as of the date the Board found the employees would have been discharged for economic reasons. The petitioners do not challenge the Board's finding that Carrier would have ceased trucking operations in Knoxville, Tennessee, the location where the petitioners were employed, for legitimate economic reasons. The petitioners' only complaint is that the Board erred in concluding that

* The Honorable Herman J. Weber, United States District Court for the Southern District of Ohio, sitting by designation.

Carrier would not have transferred them to another location when the closure occurred. Relying on its finding, the Board refused to order reinstatement and tolled back pay as of the date on which the Board found the employer would have closed its facility absent antiunion animus. For the reasons stated below, we decline to disturb the Board's order.

## I. Background

Until their March 30, 1981 discharge, the petitioners were employed by Pacemaker Driver Service, Inc. (Pacemaker). Pacemaker, in turn, leased the drivers to Carrier Trucking Service (CTS), a business operation run by Carrier Corporation. Carrier operated trucks only for shipment of its own freight. The sole purpose of the operation was to save money. Accordingly, Carrier operated its own trucks only when it could do so at a price less than that charged by commercial shippers.

Though dispatching of drivers was done from a central location, Carrier located the trucks and drivers in a number of cities throughout the United States. The four petitioners and the two trucks they operated were domiciled in Knoxville, Tennessee. On March 30, 1981, Carrier relocated the two trucks that had been domiciled in Knoxville and accordingly, ceased leasing the four drivers' services from Pacemaker. In a prior hearing, the Board determined that Carrier closed its Knoxville operations at least in part because the drivers were threatening to unionize. The Board also determined that Carrier was a joint employer of the petitioners. A prior panel of this Court enforced the Board's finding that Carrier had violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), by discharging the petitioners for union activity. *Carrier Corp. v. NLRB*, 768 F.2d 778 (6th Cir.1985).[1] Accordingly, the Court enforced the Board's order that Carrier reinstate the discharged employees and com-

pensate them for lost wages. The Court refused to find Pacemaker liable for back pay, however, concluding that the evidence did not support the Board's conclusion that Pacemaker had knowingly participated in the discharge. *Id.* at 783.

Following this Court's decision, the Board held supplemental hearings to determine whether Carrier should be required to reinstate the discharged employees and to determine the amount of Carrier's back pay obligation. The principal issues to be decided were whether Carrier had an obligation to redomicile trucks in Knoxville and whether Carrier's back pay and reinstatement obligations should be tolled. At the hearing, Carrier sought to prove that its Knoxville operations would have been closed for economic reasons regardless of the unfair labor practice. Carrier presented evidence that prior to 1981, CTS operated as a truckload (TL) carrier. TL carriers transport loads only when the entire load originates at a single point and is unloaded at a single point. When the trucking industry was deregulated, Carrier found that it could save money by contracting out its TL shipping. However, Carrier found that less-than-truckload (LTL) shipping could, by this time, be operated more cheaply through CTS than through private shipping contracts. LTL shipping involves loads that are picked up and/or delivered at multiple points. For example, a truck may deliver a portion of a truck load to several customers.

Nevertheless, the change to LTL shipping caused Carrier to restructure its shipping operations. Of relevance to this case, Carrier concluded that it could save money by reducing the number of trucks it used and the number of cities out of which the trucks operated. In 1981, prior to the implementation of changes, Carrier operated 22 trucks domiciled in 12 cities. By February 1985, Carrier operated only 13 trucks domiciled in 6 cities. The Board found that even if the trucks located in Knoxville,

---

**1.** In enforcing this order, the prior panel noted that Carrier had "substantial day-to-day control over the drivers' working conditions," that "Pacemaker officials consulted the Carrier officials over wages and fringe benefits for the

drivers," and that "Carrier had the authority to reject any driver that did not meet its standards and it could also direct Pacemaker to remove any driver whose conduct was not in Carrier's best interests." *Id.* at 781.

Tennessee, had not been eliminated in 1981 for impermissible reasons, Carrier would have ceased Knoxville operations by February 1985.

Carrier contended that when it ceased operations at a specific location for economic reasons, it terminated the contract through which it leased employees at that location. Accordingly, Carrier argued that its liability for back pay should end at the same time it would have closed the Knoxville location for legitimate economic reasons.

The Administrative Law Judge (ALJ) who heard the case determined that Carrier would have closed its operations in Knoxville no later than February 10, 1985. Accordingly, the ALJ recommended Carrier not be required to reopen that facility. Nevertheless, he did not believe that Carrier's back pay and reinstatement obligations ceased at that time. The judge reasoned that it was not enough that Carrier proved it had no policy to relocate drivers when it closed its facilities. The mere fact that Carrier terminated its contract merely demonstrated that Carrier did not perform the relocation when domiciles were closed. It did not show that Pacemaker did not relocate drivers. In order to meet this burden, the ALJ felt that Carrier would have to show that none of the drivers at any of its closed domiciles had been permitted to transfer to a location that remained open.

A three member panel of the Board reviewed the ALJ's proposed findings. The panel accepted the ALJ's finding that the Knoxville site would have been closed by early 1985, but, with one member dissenting, the panel concluded that Carrier had met its burden to prove the drivers would have been terminated as of that date. *See Boland Marine and Mfg. Co.*, 280 N.L.R.B. 454 (1986). On this issue, the panel reasoned Carrier had met its burden by demonstrating that its practice was not to "relocate drivers when it eliminated or redomiciled equipment." "[R]ather, the driver leasing company [Pacemaker] generally reassigned them to another account." Although the Board did not believe such a showing would be sufficient in all cases, it

did believe that it was sufficient in this case since Carrier was permanently reducing the size of its fleet of trucks and drivers and had used drivers which were "leased from and employed by another company."

Carrier voluntarily complied with the Board's Supplemental Decision and Order. The four discharged employees then brought this action to challenge the Board's decision to toll back pay and not to order reinstatement. The petition is brought pursuant to section 10(f) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(f), which allows parties aggrieved by a Board order to seek review of that order in the circuit courts. Because Carrier has a substantial interest in the outcome of the petition, the Court granted its petition to intervene pursuant to Fed.R. App.P. 15(d).

## II. Discussion

Initially, the petitioners argue that the Board's decision is not entitled to deference from this Court because it proceeds from a misunderstanding of the law. Alternatively, the petitioners assert that the Board's factual findings are subject to heightened scrutiny because the Board reversed the proposed factual findings of the ALJ and did not reach a unanimous conclusion. Both of these arguments are incorrect. Initially, it should be made clear that it is the Board's findings of fact that the petitioners wish to challenge. Although the petitioners attempt to recast the Board's decision as one based on "statistical probability" or one misapplying the burden of proof, this is clearly not the case. The Board clearly understood the legal standard, concluding that in order to escape a reinstatement order and toll back pay, Carrier's legal burden was to show by a preponderance of the evidence that it would have terminated the petitioners for legitimate business reasons at some future date. *Accord NLRB v. Master Slack Corp. and/or Master Trousers*, 773 F.2d 77, 83 (6th Cir.1985) ("It is improper, however, to award back pay if an employer can show that even if employees had been treated with total fairness they would have

been discharged at some later date.").[2] Accordingly, in order to prevail the petitioners must show that the Board's findings of fact are not supported by the record or that the facts and conclusions drawn from those facts do not support the Board's finding that Carrier met its burden of proof.

█ The petitioners also overstate their case somewhat when they assert that the Board's decision is entitled to heightened scrutiny and less deference because it conflicts with the ALJ's determinations in the matter. It is true that courts tend to examine the Board's findings more closely when they conflict with those of the hearing officer. *See, e.g., Litton Microwave Cooking Prods. Div. v. NLRB*, 868 F.2d 854, 857 (6th Cir.1989) ("Although the Board is free to find facts and to draw inferences different from those of the administrative law judge, a 'reviewing court has an obligation to examine more carefully the evidence in cases where a conflict exists.'") (quoting *Pease Co. v. NLRB*, 666 F.2d 1044, 1047–48 (6th Cir.1981), *cert. denied*, 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982)). Nevertheless, it is still the Board's findings of fact that a court is commanded to review, and these findings must be upheld if supported by substantial evidence on the record as a whole. The ALJ's findings are a part of that record, but their significance "largely depends on the importance of witness credibility in the particular case." *Litton*, 868 F.2d at 857; *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496–97, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951).

█ Essentially, the petitioners' argument is that Carrier did not meet its burden to prove by a preponderance of the evidence that the petitioners would have been terminated if Carrier had closed its Knoxville operations for economic reasons. The petitioners do not challenge the Board's finding that the Knoxville site would have been closed for economic reasons. They only challenge the further conclusion that Carrier discharged all employees at a location when the location was closed for economic reasons.

The Board relied on the testimony of two Carrier witnesses in reaching its conclusion that Carrier terminated drivers when it redomiciled the trucks the drivers operated. First, the Board credited the testimony of Clyde S. Henninger, Jr., the Manager of CTS at all times relevant to this case. Henninger testified:

Q: In the process of trimming the fleet, what happened to the drivers whose trucks were eliminated from the system in the process?

A: Their respected [sic] employers of Driver Leasing Company would generally assign them to another account.

The Board also credited the testimony of Joe Weisenburger, Pacemaker's manager for the central area of the United States. Weisenburger testified:

Q: Okay. From your experience in dealing with Carrier, was it unusual for Carrier to move the permanents[3] from one location to another?

\* \* \* \* \* \*

A: No, it was fairly common.

2. The petitioners have cited cases such as *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985), and *NLRB v. A & T Mfg. Co.*, 738 F.2d 148, 149 (6th Cir.1984) for this same proposition. Although these cases apply by analogy, they are not directly applicable on the facts before us. Both apply to so-called mixed-motive cases where the employer is alleged to have both permissible and impermissible motives in discharging employees. These cases both held that where impermissible motives have been shown to be a factor in the employer's decision, the burden of proof shifts to the employer to prove by a preponderance of the evidence that it would have discharged the employees even if the impermissible motivations were not present. In the case before the

Court, the original motive for discharge was entirely impermissible. Carrier has not attempted to prove that it would have discharged the employees for permissible reasons on the same date it discharged them for impermissible reasons. Instead, Carrier has attempted to show that it would have discharged them for permissible reasons at some date after the impermissible discharge but before the current date, thus tolling back pay obligations and extinguishing the duty to rehire them.

3. Apparently the word "permanents" was understood to mean the permanently domiciled trucks.

Q: Now, since this is where Carrier would move equipment from one location to another. What happened to the drivers at the location where the truck was eliminated?

A: They were usually laid off. And we recruited, put new drivers on the new location, normal.

Q: To your recollection, was there an instant [sic] where Carrier transported employees from one location to another? As a result of predomitiling [sic] of trucks?

A: I don't believe so.

The ALJ did not reject the truth of this testimony. Rather, the ALJ concluded that the testimony did not prove that the drivers would not have been transferred and reassigned to a Carrier account by Pacemaker when the trucks in Knoxville were redomiciled.

On balance, the Board's determination that the evidence was sufficient to prove that Carrier "discharged" drivers when it redomiciled the trucks they operated is not clearly erroneous. The petitioners assert that Carrier never demonstrated that it had a policy to terminate drivers when it redomiciled trucks, but only demonstrated that drivers were "normally" or "generally" terminated. Proof such as this, they assert, amounts to little more than statistical evidence that many drivers were not transferred, a showing that may not be sufficient to meet an employer's burden of proof. *See Boland*, 280 N.L.R.B. at 454.

Although the petitioners' argument is not completely lacking in merit, it mischaracterizes the nature of the evidence relied on by the Board. It might well be insufficient for a company to prove that it "usually" or "generally" discharged employees in a given situation but had no policy to do so.[4] This case does not involve the paradigm employer-employee setting, however. Here, Carrier did not directly employ the petitioners. Rather, it leased their services through Pacemaker. There was no need for Carrier to adopt a specific policy to terminate drivers when it no longer needed their services at a particular location since Carrier never formally employed them.[5] It is enough that Carrier has shown that it would have ceased leasing the petitioners' services from Pacemaker and allowed Pacemaker to make the decision as to what happened to the specific employees it had assigned to the account.

The petitioners assert that allowing Carrier to shift responsibility for the termination decision to Pacemaker and thereby escape liability is inequitable since Carrier has been found to be a joint employer, and this Court found Pacemaker not liable for the unfair labor practices committed by Carrier. Instead, the petitioners assert that Carrier must show that it would have taken some action other than cessation of trucking operations in Knoxville that would have ended the employer-employee relationship.[6]

The petitioners' argument appears to proceed from a misunderstanding of joint employer status. A finding of joint employer status does not require the Board to ignore the reality of the employment situation. Here, Pacemaker formally employed the petitioners. Carrier leased the petitioners' services through Pacemaker. Although Carrier exercised control over the leased employees' working conditions, the evidence before the Board suggested that Carrier did not have any responsibility for

---

**4.** In this case, however, it appears that the terms "usually" and "generally" were employed merely to demonstrate that Carrier and Pacemaker had no formal policies, not that employees were regularly transferred to new Carrier accounts. As already noted, Pacemaker's area manager testified that he could not recall a single instance when an employee was transferred. The Board could reasonably conclude that Carrier met its burden of proof by showing that its past practices would have led to the petitioners' discharges.

**5.** This fact is not inconsistent with the Board's prior finding, enforced by this Court, that Carrier was a joint employer of the petitioners. Such a finding is binding only for purposes of allowing the Board to bind Carrier. It does not change the reality of the legal relationship under which the petitioners were employed.

**6.** The petitioners do not state what policy they believe Carrier should have enacted in order to extinguish its back pay liability.

the fate of the drivers once it ceased leasing their services. Carrier has shown that when it ended trucking operations at a particular location for economic reasons, it informed the driver leasing corporation that Carrier no longer wished to lease drivers at that location. The leasing corporation—in this case Pacemaker—was then free to terminate the drivers, transfer the drivers to a new account, or transfer the drivers to another account where Carrier was seeking drivers. The assertion that Pacemaker, a third party not privy to the unfair labor practices committed by Carrier, might have transferred the employees to another Carrier account in a different city had the terminations occurred in 1985 rather than 1981, is simply too speculative to form the basis for continued back pay liability.

Accordingly, we decline to disturb the Board's order.