**TUALATIN ELECTRIC,
INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**International Brotherhood of Electrical
Workers, Local 48, Intervenor.**

No. 00–1242.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 8, 2001.

Decided June 15, 2001.

Karen O'Kasey argued the cause for petitioner. With her on the briefs was Thomas M. Triplett.

Steven B. Goldstein, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Leonard R. Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Julie B. Broido, Supervisory Attorney.

Norman D. Malbin argued the cause and filed the brief for intervenor International Brotherhood of Electrical Workers, Local 48.

Nora H. Leyland and Victoria L. Bor were on the brief for amicus curiae International Brotherhood of Electrical Workers, AFL–CIO.

Before: GINSBURG, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Making use of a tactic called "salting," the International Brotherhood of Electrical Workers, Local No. 48 authorized several of its members to seek work at Tualatin Electric, a nonunion electrical contractor, in order to advocate union membership among Tualatin's employees and to gather information that might assist the Union in an election campaign. Tualatin discharged one such employee, or "salt," because of his union activity and refused to hire four other job applicants because it suspected they were affiliated with the Union. The National Labor Relations Board held, in proceedings not here under review, that the dismissal and the refusals to hire were un-

fair labor practices in violation of the §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3). *See Tualatin Electric, Inc.*, 312 NLRB 129, 135, 1993 WL 361183 (1993) ("*Tualatin I*"), enf'd sub nom. *Tualatin Electric, Inc. v. NLRB*, 84 F.3d 1202 (9th Cir. 1996) (discharge); *Tualatin Electric, Inc.*, 319 NLRB 1237, 1237 (1995) ("*Tualatin II*") (refusals to hire).

After further proceedings the Board awarded backpay to the five discriminatees. *See Tualatin Electric, Inc.*, 331 NLRB No. 6, slip op. at 1–2, 2000 WL 633393 (2000) ("*Decision*"). Tualatin petitions for review of the *Decision* on the grounds that salts are not entitled to backpay under the Act and, in the alternative, that the Board miscalculated the amounts of backpay due the salts in this case. Because the Board's determinations are based upon reasonable interpretations of the Act and of the Board's own precedents, we deny Tualatin's petition and grant the Board's application for enforcement.

## I. Background

In 1992 the Union began an effort to organize Tualatin by salting Project Thunder, a construction site at which Tualatin was a subcontractor. Under its "salt program," the Union paid its agents working in non-union shops the amount necessary to bring their wages up to union scale; it also required salts to terminate their employment at the Union's behest, or else to face substantial fines. *See Decision* at 3 n.1; *Tualatin II*, 319 NLRB at 1239. The Union's salting campaign against Tualatin continued until December 20, 1993, when it advised Tualatin by letter that it no longer sought either "to organize ... [or] to represent Tualatin's employees"; referring to the discharge and the refusals to hire at issue in this case, the Union said that instead it "intend[ed] to use picketing to

truthfully advise the public of Tualatin Electric's illegal acts." *Decision* at 6.

In July 1992 Edward Campbell, having agreed to salt Tualatin for the Union, sought and obtained a job as a journeyman electrician on Tualatin's Project Thunder. Two weeks later he was cashiered. *Tualatin I*, 312 NLRB at 131. In settlement of the resulting unfair labor practice (ULP) case, Tualatin agreed to reinstate Campbell; when Campbell reported for work, however, Tualatin assigned him not to Project Thunder but to its Wal–Mart jobsite, which increased his round-trip daily commute by at least 60 miles. *See Tualatin I*, 312 NLRB at 132; *Decision* at 6. Campbell, believing that employment at Wal-Mart did not constitute "reinstatement," abandoned the job after two days. *Tualatin I*, 312 NLRB at 132. The Board concluded that Tualatin violated the settlement agreement by substituting Wal–Mart for Project Thunder, and that Tualatin had dismissed Campbell in the first place because of his union activity. *Id.* at 133, 135. The Board ordered Tualatin to reinstate Campbell and scheduled further proceedings to determine the amount of backpay due him. *Id.* at 129, 135. The Ninth Circuit denied Tualatin's petition for review of the Board's holding that it had violated the settlement agreement. *See Tualatin Electric*, 84 F.3d at 1205.

Several months after Campbell's botched reinstatement, Tualatin denied the employment applications of four other union salts, including Gary Mangel. The Board found that Tualatin had unlawfully refused to hire the four because it knew or suspected they were connected with the Union. The Board ordered that they be hired and that further proceedings be conducted to determine the amount of backpay due each. *Tualatin II*, 319 NLRB at 1241–42. Tualatin agreed not to contest the "findings of fact and conclusions of law underlying" *Tualatin II* except insofar as

they concerned "the amount of backpay due"; the Board then consolidated the backpay proceedings arising from *Tualatin I* and *Tualatin II*. *Decision* at 3.

In those proceedings the ALJ rejected Tualatin's argument that salts are not entitled to backpay under the Act. He also held that the salts' backpay remedies should be calculated under the rubric of *Dean General Contractors*, 285 NLRB 573, 1987 WL 89852 (1987), whereby the Board presumes, subject to rebuttal by the employer, that an unlawfully discharged employee in the construction industry would have been reassigned to a new project upon the termination of the project at which he had been working. The ALJ further held, contrary to Tualatin's position, that (1) backpay was available for the period after the Union's letter announcing the termination of its organizing effort; and (2) seeking employment exclusively at union shops did not breach the salts' duty to mitigate, for which "a discriminatee need only follow his regular method for obtaining work." *Id.* at 5.

The ALJ also resolved several issues regarding mitigation in favor of particular discriminatees. He concluded that the period for which Campbell was due backpay was not tolled by his departure from the Wal–Mart project; "inasmuch as the Ninth Circuit and the Board had concluded that his reinstatement was invalid, Campbell was not required to have accepted it under any circumstances." *Id.* at 6. Nor was backpay tolled when Campbell resigned a salting job with another nonunion contractor at the direction of the Union; avoiding union discipline, ruled the ALJ, is "good cause" for quitting a nonunion job. *Id.* Finally, the ALJ held that backpay for Gary Mangel was not tolled when he refused several short-term jobs so that he would not lose his eligibility for a long-

term job under the rules of the Union's hiring hall. *Id.* at 9.

The Board upheld the decisions of the ALJ in all respects, *id.* at 1–2, Member Hurtgen dissenting in part. Tualatin now petitions for review of the Board's decision, and the Union intervenes on behalf of the Board.

## II. Analysis

■ Tualatin challenges several of the legal principles the Board applied in calculating the amount of backpay due the discriminatees. We uphold the Board's legal determinations so long as they are neither arbitrary nor inconsistent with established law. *See, e.g., Lee Lumber & Bldg. Material Corp. v. NLRB,* 117 F.3d 1454, 1460 (D.C.Cir.1997) (NLRB "to be given a great deal of deference in developing the rules that it will apply to particular situations").

■ First, Tualatin argues that salts are necessarily ineligible for a backpay remedy, which "must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of" an ULP. *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 900, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (emphases omitted). The employer contends that a damages due a salt are invariably speculative because a salt's job tenure depends not only upon his employer but also upon his union. Contrary to the Board's claims, Tualatin is not estopped from making this argument by its agreement not to contest the findings and conclusions reached in *Tualatin II:* the argument addresses "the amount of backpay due," which Tualatin expressly reserved the right to challenge. Nor is the argument precluded by *Tualatin Electric v. NLRB,* which decided only that Campbell's assignment to the Wal–Mart project did not amount to reinstatement, and enforced a Board order that by its terms requires further proceedings to determine Tualatin's backpay liability. 84 F.3d at 1205–06.

On the merits, however, we agree with the Board that Tualatin's argument is incompatible with the Supreme Court's holding that, although he "serv[es] two masters," a salt is an "employee" within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(3). *NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 94–95, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995). In light of the Court's holding that salts "do not forfeit their 'employee' status or their statutory protection from unlawful discrimination," the Board properly reasoned that neither "do [salts] forfeit their eligibility for backpay ... to remedy the discrimination." *Decision* at 1 (citing *Town & Country,* 516 U.S. at 95, 116 S.Ct. 450).

■ Second, Tualatin objects to the Board's presumption that the discriminatees' employment would not have ended with Project Thunder, which the Board based upon a line of cases originating with *Dean,* 285 NLRB at 575. *See Decision* at 1; *see also Casey Elec. Inc.,* 313 NLRB 774, 774, 1994 WL 66587 (1994). An employer may rebut the *Dean* presumption by showing that under its "established policies," the employee would not have been reassigned. *Decision* at 1. Tualatin does not claim to have rebutted the presumption; instead it argues that *Dean* should be overruled or, in the alternative, not applied to cases involving salts. Again we reject the Board's objection to an argument being raised but agree with the Board on the merits.

The Board contends that its reliance upon *Dean* in *Tualatin I* and *Tualatin II* precludes Tualatin from relitigating here the applicability of that case; in fact, however, the two earlier proceedings leave open the question whether *Dean* should be applied when calculating backpay for salts. In *Tualatin I* the only reference to *Dean* is "for the proposition that the question of whether backpay is due a discriminatee

... is appropriately resolved during the compliance process." *Tualatin I,* 312 NLRB at 129 n. 1. Although the Board said in *Tualatin II* that "reinstatement and backpay recommendations are subject to the procedures discussed in *Dean,*" 319 NLRB at 1242, here the employer, as we noted above, reserved the right to challenge those aspects of *Tualatin II* relevant to the calculation of "the amount of backpay due."

On the merits, Tualatin first suggests generally that the *Dean* rule is unduly complicated and prejudicial to employers in the construction industry, who in staffing an ever-changing roster of projects will often have lawful reasons for not transferring a particular employee. That is no basis, however, for concluding that *Dean*'s allocation of the burden of production is arbitrary or contrary to law.

The employer then claims that *Dean* should not be applied to salts. *Dean* places upon the employer the burden of showing that an employee would not have been transferred in part because the relevant "[e]vidence ... would tend primarily to be in the possession of the respondent employer which controls the decision whether to transfer or reassign." *Dean,* 285 NLRB at 574–75. Tualatin argues that because a salt's ability to "transfer or reassign" depends upon the union's approval, in salting cases it is the union that "tend[s] primarily" to have the relevant evidence. To continue imposing the evidentiary burden upon the employer when the evidence is in the hands of the union would, according to Tualatin, be a "terrible injustice."

Tualatin overstates the degree to which the *Dean* presumption is based upon the employer's superior access to evidence; that is but one of several reasons underpinning *Dean.* At least as important, per the Board, is the judgment that the policies of the Act make it undesirable "to apply a presumption in favor of an adjudicated wrongdoer while seeking to remedy the underlying unfair labor practice committed against the aggrieved employee." *Dean,* 285 NLRB at 574; *see also Ferguson Elec. Co., Inc.,* 330 NLRB No. 75, slip op. at 3, 2000 WL 85273 (2000), *enf'd,* 242 F.3d 426 (2d Cir.2001) ("The Board resolves compliance-related uncertainties or ambiguities against the wrongdoer"). The principle that the party who has acted unlawfully should bear the burden of producing evidence for the purpose of limiting its damages has as much force in a case involving salts as in any other. We therefore hold that the Board may apply the *Dean* presumption when calculating the backpay due to salts. The employer, of course, retains the correlative right to seek out and to present evidence that a salt would not have been transferred at the conclusion of the project on which he last worked, whether by reason of the union's policies or of its own.

■ Third, Tualatin objects to the Board's determination that the salts "satisf[ied] their obligation to mitigate damages because they followed their normal pattern of seeking employment through the Union's hiring hall." *Decision* at 1. The employer claims first that the agency precedents the Board cites in support of this conclusion are distinguishable and inapposite. That is of no moment, for the Board is entitled to elaborate upon its previous decisions in any way that it reasonably believes will advance the purposes of the Act. The Board did not unreasonably extend its precedents in applying here its rule that an employee's normal job seeking efforts fulfill the duty to mitigate. *See Ferguson Elec.,* 330 NLRB No. 75, slip op. at 6 ("In seeking interim employment, a discriminatee need only follow his regular method for obtaining work"); *cf. Big Three Indus. Gas,* 263 NLRB 1189, 1217

(1982), *overruled on other grounds, American Navigation Co.*, 268 NLRB 426, 427 (1983) (reasonable for employee searching for work in mitigation to hew to job seeking patterns "tradition[al] in the trade").

Tualatin also echoes an argument raised by Member Hurtgen in dissent: because salts were authorized to work on some nonunion jobs at the time they were dismissed or not hired, they should be required to seek nonunion work in mitigation. As Member Hurtgen put it, that the Union might not approve of such employment "cannot be a justification for a failure to mitigate." *Decision* at 3. Although that position is certainly reasonable, it is not unreasonable for the Board to limit the duty to mitigate so as not to require a salt to accept employment that would subject him to union discipline or require him to abandon full union membership. We therefore uphold the Board in this respect as well.

■ Fourth, Tualatin challenges the Board's decision that backpay continued to accrue after the Union announced the end of its salting campaign. According to Tualatin this is inappropriate because the end of the Union's organizing effort also would have marked the end of the salts' employment. As the Board points out, however, what Tualatin ignores is that "the Union continued to authorize its members to work for the Respondent after [the end of the campaign] in order to obtain information in support of its area standards picketing." *Decision* at 1 n.1. We therefore reject Tualatin's argument.

Fifth, Tualatin contends that its backpay obligation to Campbell ended when he quit two days after Tualatin had "reinstated" him at the Wal–Mart Project. Because "Project Thunder was coming to a conclusion" while the Wal–Mart project "promised substantial additional work into the indefinite future," Tualatin maintains that Campbell at least should have been re-quired to keep working while he asked the Board for relief. "[P]ublic policy reasons," says Tualatin, "strongly support the work and grieve concept." The Board, however, unanimously adopted the conclusion of the ALJ that Campbell's quitting was not a breach of his duty to mitigate because, "as the Ninth Circuit and the Board had concluded that his reinstatement was invalid, Campbell was not required to have accepted it under any circumstances." *Decision* at 6. The Board also noted that the Wal–Mart project was significantly further from Campbell's home than was Project Thunder, making the two positions not "substantially equivalent." *Id.* Tualatin nowhere explains why its policy judgment should outweigh the deference owed to the Board's contrary judgment.

■ Alternatively, Tualatin claims the Board should have tolled Campbell's backpay as of his acceptance, with Union approval, of employment as a salt at another nonunion contractor. Campbell worked at that job for two weeks before quitting at the behest of the Union. *See Decision* at 2. The Board held that Campbell could, without reducing his entitlement to backpay, resign rather than having to stay on that job and "subject himself to internal union discipline." *Id.* Tualatin argues that the precedent cited by the Board, *Local 90 Operative Plasterers and Cement Masons' Int'l Ass'n v. Bovinett*, 252 NLRB 750, 754, 1980 WL 12472 (1980), is not controlling; that is irrelevant because the Board never suggested its holding was compelled by that case. *See Decision* at 2. Tualatin argues further that it is "[in]appropriate," "ironic[]," and contrary to both "[c]ommon sense" and "[c]ommon decency" to hold a salt's employer liable for backpay when "the Union, for its own reasons, elects to require its employee/members to terminate [their mitigating] employment with a third party." The Board,

however, is of the view that it would be "inappropriate" to require an employee acting to mitigate the injury caused by an employer's ULP to subject himself to union sanctions that he would not have incurred had the employer not acted unlawfully. Mere disagreement with this policy view — and that is all Tualatin offers — is not a basis upon which this court may reverse a decision of the Board. *See, e.g., Pacific Micronesia Corp. v. NLRB*, 219 F.3d 661, 665 (D.C.Cir.2000).

■ Finally, Tualatin objects to the Board's holding that Mangel did not breach his duty to mitigate by declining offers of short-term work so he could remain eligible, under the rules of the Union's hiring hall, for a long-term assignment. *See Decision* at 9. The Board endorsed the ALJ's determination that "[a] discriminatee may legitimately refuse a referral if he can reasonably expect to obtain employment in the future which would clearly be a better opportunity." *Id.* (quoting *Plumbers Local 305*, 297 NLRB 57, 60, 1989 WL 224394 (1989)). Yet again, Tualatin's argument that the ALJ's decision is not compelled by the cited precedent is unavailing. Tualatin also argues that it would be more sensible to require an employee to accept any job offered because one can never be sure how long a purportedly longer job will actually last. In the view of the Board, however, an employee does not violate his duty to make a "diligent or reasonable search" for work when he rejects a short-term assignment based upon a "reasonable expectation" — which necessarily falls short of a certainty — that doing so will enhance his chances to secure a long-term job. *See Decision* at 9. This position, being neither unreasonable nor contrary to precedent, commands the deference of the court.

### III. Conclusion

Because the Board's *Decision* is reasonable and consistent with applicable law, we deny Tualatin's petition for review and grant the Board's application for enforcement.

*So ordered.*