285 F.3d 326
 ANECO INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Region 12, Respondent,
International Brotherhood of Electrical Workers Local 606, Intervenor.
International Brotherhood of Electrical Workers, AFL-CIO, Amicus Curiae.
National Labor Relations Board, Petitioner,
v.
Aneco Incorporated, Respondent,
International Brotherhood of Electrical Workers Local 606, Intervenor.
International Brotherhood of Electrical Workers, AFL-CIO, Amicus Curiae.
 No. 01-1572.
 No. 01-1681.
 United States Court of Appeals, Fourth Circuit.
 Argued December 4, 2001.
 Decided March 29, 2002.
 
 ARGUED: William E. Sizemore, Thompson, Sizemore & Gonzalez, P.A., Tampa, Florida, for Aneco. Anne Marie Lofaso, Office of the General Counsel, National Labor Relations Board, Washington, D.C., for Board. Joseph Egan, Jr., Egan, Lev & Siwica, P.A., Orlando, Florida, for Intervenor. ON BRIEF: John W. Bencivenga, Thompson, Sizemore & Gonzalez, P.A., Tampa, Florida, for Aneco. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Acting Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Robert J. Englehart, Supervisory Attorney, Rachel Gartner Lennie, Office of the General Counsel, National Labor Relations Board, Washington, D.C., for Board. Tobe Lev, Egan, Lev & Siwica, P.A., Orlando, Florida, for Intervenor. Nora H. Leyland, Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Washington, D.C., for Amicus Curiae.
 Before WIDENER and LUTTIG, Circuit Judges, and JOSEPH R. GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.
 Petition granted in part and denied in part, cross-petition granted in part and denied in part, and remanded by published opinion. Judge LUTTIG wrote the opinion, in which Judge WIDENER joined. Judge GOODWIN wrote an opinion concurring in part and dissenting in part.
 OPINION
 LUTTIG, Circuit Judge.
 
 
 1
 On July 12, 1993, Winson Cox applied for a job as an electrician with Aneco, Inc., a non-union contractor. J.A. 1222. Cox was a paid, full-time union organizer for the International Brotherhood of Electrical Workers, Local Union Number 606 ("the Union"), J.A. 1226, and he sought employment with Aneco to help organize Aneco's workers. J.A. 779. This process, where union organizers seek to become employees of a company targeted by the union, is known as "salting." Typically, union "salts" only work for an employer as long as there is a prospect of success at organizing its workers, and they are trained to leave an employer by striking rather than resigning, so as to preserve their rights to reinstatement. J.A. 648-49, 838, 1554.
 
 
 2
 Cox disclosed his motives during his job interview, and Aneco refused to hire him. Id. Five years later, on February 27, 1998, the National Labor Relations Board ("the Board") held that Aneco's refusal to hire Cox violated sections 8(a)(1) and (a)(3) of the National Labor Relations Act ("NLRA"). The Board ordered that Cox be made "whole for any loss of earnings and other benefits he may have suffered ... from the date he applied for employment to the date Respondent makes him a valid offer of employment." Aneco, Inc., 325 NLRB 400, 401, 1998 WL 95462 (1998).
 
 
 3
 In response to the Board's ruling, Aneco offered Cox employment on April 1, 1998. J.A. 1219. Cox accepted the offer and worked for Aneco for about five weeks, leaving during an unfair labor practice strike called by a Local from Tampa. J.A. 932. Cox never made an offer to return to work for Aneco nor did he request reinstatement. J.A. 932.
 
 
 4
 Paid union organizers who seek employment with other companies are protected by the National Labor Relations Act. See NLRB v. Town & Country Electric, Inc., 516 U.S. 85, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995). Aneco conceded that its refusal to hire Cox in 1993 was an unfair labor practice, J.A. 1029, however, Aneco and the General Counsel were unable to agree on the appropriate amount of backpay owed to Cox. The General Counsel sought backpay in the amount of $47,349.29, for ten of the nineteen quarters between July 12, 1993 (the date Aneco unlawfully refused to hire Cox) and April 1, 1998 (the date Aneco hired Cox). J.A. 910.[1] Aneco opposed this, arguing that Cox did not conduct a reasonable search for interim employment during those ten quarters and, hence, did not fulfill his duty to mitigate his income loss. In the alternative, Aneco contended that the period of Cox's backpay award should be far shorter than the ten quarters sought by the Board because it is wrong to assume that Cox, had he been hired by Aneco in July of 1993, would have continued working at Aneco through April 1, 1998. Aneco argued that Cox, as a union "salt," would have left Aneco when his employment there no longer served the Union's organizational interests; hence, Cox would not have worked ten quarters for Aneco and should not be awarded $47,349.29 in backpay.
 
 
 5
 After a compliance hearing, the Administrative Law Judge rejected Aneco's argument that Cox failed to mitigate his income loss. J.A. 1050-51. However, the ALJ refused to award Cox the full $47,349.29 in backpay sought by the General Counsel, and instead awarded Cox five weeks of back pay in the amount of $1,461.15. J.A. 1052. Noting that Cox, as a union "salt," "would have spent no more time working for [Aneco] than necessary to organize its employees or conclude that such organizing would not be practical," J.A. 1040, the ALJ concluded that, had Aneco hired Cox in July of 1993, he would have only worked five weeks for Aneco. J.A. 1051. In so concluding, the ALJ relied on the fact that Cox, when finally hired by Aneco in April of 1998, worked only for five weeks before leaving.
 
 
 6
 The Board reversed the ALJ's finding that Cox would have only worked five weeks for Aneco had he been hired in 1993, stating that Aneco failed to present "specific evidence" on this issue. J.A. 1050. Relying on the "well-established principle that `[t]he Board resolves compliance-related uncertainties or ambiguities against the wrong-doer,'" the Board ordered that Aneco pay Cox the full $47,349.29 in backpay sought by the General Counsel. J.A. 1050 (citations omitted). The Board also found, as did the ALJ, that Cox fulfilled his duty to mitigate. J.A. 1050 n. 3.
 
 
 7
 Aneco petitions this court for review, and the Board cross-petitions for enforcement of its order. For the reasons that follow, we grant enforcement in part, deny enforcement in part, and remand.
 
 I.
 
 8
 Title 29, U.S.C. § 160(c) authorizes the Board to award backpay in response to an unfair labor practice. However, a backpay order may only serve as a compensatory, make-whole remedy, not a punitive sanction or deterrent. See NLRB v. Pepsi Cola Bottling Co. of Fayetteville, Inc., 258 F.3d 305, 314 (4th Cir.2001). A backpay order is a means to "restore the situation `as nearly as possible, to that which would have obtained but for the illegal discrimination.'" Coronet Foods, Inc. v. National Labor Relations Board, 158 F.3d 782, 798 (4th Cir.1998) (quoting Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)).
 
 
 9
 Aneco raises two challenges to the Board's award of backpay, and we address each for abuse of discretion. See Coronet Foods, 158 F.3d at 798 (4th Cir.1998).
 
 A.
 1.
 
 10
 Aneco first argues that Cox did not conduct a reasonable job search between July 12, 1993 and April 1, 1998 and, therefore, failed to mitigate his income loss. After Aneco refused Cox employment in 1993, Cox did not embark on the type of thorough job search one would expect from one who is unemployed. There were several reasons for this failure, all related to Cox's role as a union "salt." First, Cox already had a full-time job with the Union, which dampened his financial incentives to obtain additional employment. J.A. 716. Moreover, because Cox's purpose in seeking a second job was to organize the workers of that company on behalf of the Union, Cox only applied to companies where there was a realistic chance to organize their workers. The Union forbade Cox from applying to work for companies that were already unionized, including all companies that hired through the Union's hiring hall. J.A. 1042. In addition, Cox could not work for small companies with too few employees to be of organizing interest to the Union, J.A. 579, 1004, nor large companies with so many employees that organizing them would be difficult, J.A. 576, 1036. Given these restrictions, Cox visited a total of only 50 companies during the ten quarters for which the Board awarded backpay. J.A. 1469.
 
 
 11
 Finally, in addition to the narrow scope of his job search, Cox further hurt his chances of finding employment by bringing other electricians with him when he applied for a job, some of whom were better qualified than he. J.A. 860-61, 1232.[2] Apparently, Cox brought his friends along to serve as potential witnesses at an unfair labor practice hearing, and also to increase the number of union organizers working for the non-union company.
 
 
 12
 Not surprisingly, although he maintained his full-time employment with the Union, Cox never found another job to "salt" until Aneco offered him employment in 1998.
 
 
 13
 Despite the limited nature of Cox's job search, the Board held that Cox fulfilled his duty to mitigate his income loss. According to the Board, an employer seeking to prove a failure to mitigate by a union "salt" must show that "the Union's policies unreasonably limited [the discriminatee's] job search." J.A. 1050 n. 3. Rejecting the notion that "the mere existence of any union restrictions was per se unreasonable," the Board held that Aneco failed to show that any specific restrictions on Cox's job search imposed by the Union were unreasonable. J.A. 1050 n. 3.
 
 2.
 
 14
 Employees who lose their jobs as a result of an unfair labor practice must mitigate their damages by making a "reasonable effort to obtain interim employment," and the burden of proving a failure to mitigate rests on the employer. Coronet Foods, 158 F.3d at 800. If Cox had been unemployed, rather than a full-time Union "salt," during the time of his job search, we would hold without hesitation that he failed to make a "reasonable effort" to obtain interim employment. For the typical person seeking work, it cannot be considered a "reasonable effort" to eliminate all large-scale and small-scale employers from one's job search, and we doubt it can be considered a "reasonable effort" to apply for a job with a group of friends, absent a clear understanding from the potential employer that a bloc of workers is needed.
 
 
 15
 Cox, however, was not an unemployed person looking for a job; he was a full-time employee of the Union and his purpose in seeking further employment was to advance the Union's organizational interests. Thus, the crucial issue is whether Cox's status as a paid union organizer permitted the Board to find that his job search represented a "reasonable effort," even though such a search could not be deemed reasonable if undertaken by an ordinary, unemployed discriminatee. Given the deference owed to the Board in determining backpay remedies, we conclude that it was permissible for the Board, in determining whether Cox undertook "reasonable efforts" to obtain interim employment, to take into account the duties he owed to his union employer. Previous Board decisions have held that limits on job searches designed to accommodate a discharged worker's responsibilities to another employer are reasonable, see Acme Bus Corp., 326 NLRB 1447, 1449, 1998 WL 723995 (1998) (holding that discriminatee fulfilled his duty to mitigate even though he limited his search to jobs with starting times after 8:30 am, to accommodate his full-time job as a nursing assistant); American Pacific Concrete Pipe v. General Truck Drivers Union, 290 NLRB 623, 627, 1988 WL 213915 (1988) (holding that discriminatee was not required to accept a job that would require him to abandon active duty service in the Air Force reserve), and we see no reason to question the propriety of those decisions.
 
 
 16
 We do not hold, however, that the Board may find that any restrictions on an interim job search caused by a discriminatee's duties to another employer are reasonable per se. Compare Tualatin Electric, Inc., v. NLRB, 253 F.3d 714, 719 (D.C.Cir.2001) (stating that the Board may limit the duty to mitigate "so as not to require a salt to accept employment that would subject him to union discipline or require him to abandon full union membership"). We could not, for example, uphold a finding of mitigation if the limits on a discriminatee's job search, ostensibly caused by his duties to another employer, were not reasonably related to that employment. In this case, however, we find that the Board could, without abusing its discretion, find that Cox's limited interim job search was reasonable given his duties as a union salt. While applying for jobs in groups did hurt Cox's chances of obtaining employment, Aneco is unable to show that such was "unreasonable" given the Union's need for multiple "salts" on a job site. In addition, while only 50 employers in ten quarters does not seem like a lot to visit, Aneco has failed to show that Cox neglected other employers who were also fertile targets for union organizing.
 
 
 17
 We conclude that the Board did not abuse its discretion in rejecting Aneco's argument that Cox failed to mitigate his damages.
 
 B.
 
 18
 Aneco next contests the Board's decision to award Cox backpay for ten quarters, rather than for five weeks, challenging the Board's presumption that, had Aneco hired him on July 12, 1993, Cox would have remained on the job through April 1, 1998. Aneco argues that Cox would have quit working for Aneco when it no longer served the Union's interests for Cox to stay, and that this would have occurred long before April 1, 1998.
 
 
 19
 The Board held that Aneco, as a wrongdoing employer, bears the burden of proving that Cox would not have remained at the job which he was unlawfully denied. J.A. 1049. Aneco failed to carry its burden, according to the Board, because Aneco did not present any "specific evidence" that Cox would not have worked five years for Aneco, and that any uncertainties as to this must be resolved against the wrongdoer, Aneco. J.A. 1050.
 
 
 20
 Given the evidence presented in this case, we conclude that the Board abused its discretion in calculating the backpay period on the assumption that, had he been hired in 1993, Cox would have worked for Aneco for five years. Aneco did present specific evidence to show that this assumption was indefensible. First, Cox was not an ordinary employee, but a union "salt" whose sole purpose in seeking employment with Aneco was to organize its workers. Accordingly, it was undisputed that Cox would have left his job at Aneco when it no longer served the Union's organizational interests. J.A. 572. While Cox's duties to the Union allowed us to uphold the Board's finding that Cox mitigated his damages by conducting a reasonable job search, his duties to the union undermine the Board's assumption that Cox would have stayed on the job for five years.
 
 
 21
 Second, Cox actually worked for Aneco in 1998 after the Board ordered him reinstated, and he worked for only five weeks before leaving during an unfair labor practice strike. J.A. 837. Although the Board correctly noted that this does not prove that Cox would have "invariably" departed from Aneco in five weeks had he been hired in 1993, J.A. 1050, it is still strong evidence that Cox's stint at Aneco would have been far less than five years, and strongly suggests the Board's award of backpay serves a punitive rather than compensatory function.
 
 
 22
 Finally, there are no examples in the record of a union "salt" ever remaining on the payroll of another company for five years. Harry Brown, the Union's business manager, testified that some organizing campaigns against companies other than Aneco lasted several years, J.A. 641-44, and also testified that the Union might have desired to keep Cox on Aneco's payroll for five years "if it was productive," J.A. 571-72. But there is no testimony that a union "salt" was employed at a single company for a five-year period as part of these campaigns, nor is there any indication that Cox would have stayed at Aneco for five years given the circumstances at Aneco in 1993.[3]
 
 
 23
 We acknowledge, as did the ALJ, that any calculation of how long Cox would have worked if Aneco had hired him on July 12, 1993 is "somewhat speculative." However, a backpay order must "restore the situation `as nearly as possible, to that which would have obtained but for the illegal discrimination.'" Coronet Foods, Inc., 158 F.3d at 798. In light of Cox's role as a union salt, as well as the fact that Cox only worked five weeks for Aneco when hired in 1998, we cannot enforce the Board's award of backpay premised on the assumption that Cox would have worked five years for Aneco had he been hired in July of 1993. To do so in the face of this evidence would provide a windfall to Cox and would exceed the Board's authority to award only make-whole remedies, and not punitive sanctions. See Pepsi Cola Bottling Co., 258 F.3d at 314. Unlike NLRB v. Ferguson, 242 F.3d 426, 430 (2d Cir. 2001), where there was an "absence of record evidence" as to how long the unlawfully discharged union "salt" would have remained with the employer, there is ample evidence in the record to suggest that Cox would not have worked five years for Aneco. The Board's contrary holding in the face of this evidence is an abuse of discretion, and cannot be enforced.
 
 
 24
 On remand, based upon the record in the case, we would expect the appropriate, make-whole remedy for Cox to be somewhere around the five weeks of backpay awarded by the ALJ. However, there may be circumstances, unforeseen to us, that would justify an award slightly beyond that amount. The Board's responsibility on remand is to fashion a compensatory remedy that will restore Cox, as nearly as possible, to the circumstances that he would have enjoyed but for Aneco's illegal discrimination.
 
 
 CONCLUSION
 
 
 25
 We enforce the Board's finding that Cox mitigated his income loss, but decline to enforce the Board's $47,349.29 award of backpay. The case is remanded to the Board to fashion a remedy that will restore Cox, as nearly as possible, to the circumstances that he would have enjoyed but for Aneco's illegal discrimination.
 
 
 26
 
 It is so ordered.
 
 
 
 
 Notes:
 
 
 [1]
 For nine of the quarters during that five-year period, the General Counsel conceded there was no backpay liability owed to Cox
 
 
 [2]
 The record contains a letter dated July 17, 1996, from Val Chu to Cox, which states, in part:
 Dear Mr. Cox:
 The purpose of this letter is to let you know that we have filled our needs for journeymen electricians and that we will not be offering you a position with our company. We have filled the immediate needs by hiring Mr. Albert Weber. As you know, Mr. Weber applied at the same time as you did, and highlighted his union membership. Prior to hiring Mr. Weber, we offered a position to Mr. Gary Johnson. Mr. Johnson declined to accept our job offer, telling me that he had secured other employment. As you know, Mr. Johnson also was with you when you most recently applied, and his application includes a notation that he is a "volunteer union organizer." ...
 Beyond the fact that there are sufficient candidates available to us, I do want you to know that we consider that your lack of active working at the electrical trade for the last 14 (fourteen) years as indicated on your application, makes you a candidate of last resort.... We believe that hiring people with recent experience is a more sound business practice in light of their current acclimation to the daily requirements of the craft, including safety habits.
 
 
 [3]
 The dissent contends that Aneco did not meet its evidentiary burden to rebut, by a preponderance of the evidence, the Board's presumption that Cox would not have worked five years for Aneco had he been hired in 1993. However, we believe that the dissent's reasoning, as well as the Board's, places too high a burden of proof on Aneco
 Aneco is not required to prove to a certainty, or beyond a reasonable doubt, that Cox would have left Aneco's employ before April 1, 1998. Moreover, Aneco need not pinpoint a precise date or time when Cox would have quit working. Aneco must only show that it is more likely than not that Cox would not have worked for Aneco during the entire five-year backpay period.
 This case is unlike Ferguson, where there was an absence of evidence regarding how long the union salt, whom the employer unlawfully refused to hire, would have stayed on the job. Also, the disputed backpay period in Ferguson was "only" ten months, not five years.
 We believe the evidence of Cox's role as a union salt, the fact that he only worked five weeks for Aneco in 1993, and the lack of any evidence of a union salt ever working for an employer for the extraordinarily long period of five years, was more than adequate to rebut, by a preponderance of the evidence, the Board's presumption, and that the Board abused its discretion in holding otherwise.
 
 
 
 27
 GOODWIN, District Judge, concurring in part and dissenting in part:
 
 
 28
 I concur in the court's holding that the Board properly considered Cox's duties to the Union in determining whether his job search was reasonable.* I respectfully dissent from the court's holding regarding the length of the back pay period. The majority superficially recognizes that the employer bears the burden of showing that the employee would have left earlier. The majority's application of this standard, however, shifts the burden to the employee.
 
 
 29
 Ordinarily, the back pay period runs from the date of the wrongful act to the date of reinstatement. See, e.g., NLRB v. Waco Insulation, Inc., 567 F.2d 596, 603 (4th Cir.1977) (finding that back pay was limited to the period between the unlawful discharge and the reinstatement). Once the amount of back pay due has been established, the burden shifts to the wrongful employer to demonstrate why the award should be decreased. Lundy Packing Co., 856 F.2d at 629. Our case law establishes, in effect, a rebuttable presumption that an employee will receive back pay for the entire period between the date of the unlawful act and the date the act is corrected, unless the employer produces sufficient evidence to rebut the presumption. See Tualatin Elec., 253 F.3d at 718-19 (upholding the Board's application of this presumption); Bales v. NLRB, 914 F.2d 92, 94 (6th Cir.1990) (finding that the Board clearly understood the legal standard that tolling back pay requires the employer to show by a preponderance of the evidence that employment would not have lasted the entire period).
 
 
 30
 Aneco's evidentiary burden was to prove by a preponderance of the evidence that Cox would have quit at an earlier time. The Board acknowledged that as a salt, Cox "could have left his job" with Aneco prior to April 1, 1998. J.A. 1049 (emphasis in original). The Board noted, however, that both Cox and the Union's business manager testified that there were no limits on the amount of time Cox could have worked, and that Brown testified that he would have allowed Cox to remain at Aneco for as many as five years had it proved productive to do so. Id. The Board found that Aneco,
 
 
 31
 whose burden it is, has failed to present any specific evidence showing that Cox or the Union would not have [spent an extended period of time attempting to organize a nonunion employer], nor has it shown that there was anything about the Union's organizational objectives, the Respondent's work force, or the local area economy that would invariably have led to Cox's departure after only 5 weeks.
 
 
 32
 J.A. 1050. Thus, having found insufficient evidence to rebut the presumption, the Board correctly calculated the award based on the full five-year period.
 
 
 33
 The majority claims that Aneco successfully rebutted the presumption. The majority second guesses the Board's findings — including specific crediting of testimony — and points to the following facts as evidence that the back pay period should be shortened: 1) Cox was a salt who would have quit once the Union's interests were served; 2) Cox worked only five weeks when eventually hired; and 3) the record contained no evidence of a salt ever having worked for more than five years.
 
 
 34
 Cox's salt status shows only that he could have left, not that he probably would have. That he would have left when the Union's objectives were accomplished simply restates the issue — when was that? Moreover, as the Supreme Court has noted, the simple fact that a salt might quit is irrelevant since "so too might an unpaid organizer, or a worker who has found a better job, or one whose family wants to move elsewhere." Town & Country Elec., Inc., 516 U.S. at 96, 116 S.Ct. 450. Offering an additional reason why Cox might have left is as meaningless as showing that employment will end when an employee dies or retires. The statement is true, but it is not probative of the actual date. Aneco simply supposed that Cox would have quit sooner than five years because he was a salt.
 
 
 35
 Next, the length of Cox's employment in 1998 is irrelevant to the amount of time he would have worked in 1993. There is no evidence in the record regarding whether organizing at Aneco in 1993 was easier or more difficult than in 1998. For Cox's 1998 stint to be relevant, Aneco would need to show at least that similar circumstances existed at the company in 1993 and 1998.
 
 
 36
 Finally, the lack of evidence as to how long other salts have worked at targets has no bearing on Cox's situation. In any distribution of values, the mean value is characteristic only of all the data; it does not describe any subset of the whole. The average amount of time salts work does not describe the amount of time a particular salt would work.
 
 
 37
 Admittedly, the burden a wrongful employer must bear is a difficult one, but the burden properly rests with the wrongdoer, even in cases involving salts. It is true that employers usually do not have complete information about when an employee or salt would have quit, necessarily making back pay awards somewhat uncertain. Because back pay awards are only approximations, however, such uncertainty does not render a back pay award speculative. Ferguson Elec., 242 F.3d at 430. Bearing this uncertainty is a risk wrongdoers create when they act unlawfully. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Ferguson Elec., 242 F.3d at 432. Because it is the wrongdoer's unlawful act that requires the Board to approximate back pay, it is fair and just that he, and not the discriminatee, bear the burden of the uncertainty.
 
 
 38
 This view is consistent with the underlying policies of the National Labor Relations Act. See Ferguson Elec., 242 F.3d at 432; Tualatin Elec., 253 F.3d at 718. Applying a presumption in favor of the wrong-doer would be inconsistent with the goal of protecting the interests of aggrieved employees. See Tualatin Elec., 253 F.3d at 718. As the Ferguson court noted, the wrongdoer always has the power to end the back pay period and any speculation regarding its length by offering the salt a job. Id. Moreover, forcing the wrongful employer to meet this burden also encourages employers to comply with the law and deters discrimination against salts in the first place.
 
 
 39
 Furthermore, while the burden may be difficult to meet, it is not impossible. An employer might meet its burden and toll the back pay period by presenting a wide variety of evidence. See, e.g., Tualatin Elec., 253 F.3d at 717 (noting that an employer can meet its burden by presenting evidence of established Union or employer policies, under which the employee would not have been reassigned to a new project once the original project for he which he was hired terminated); Pepsi Cola Bottling Co., 258 F.3d at 310 (stating that a back pay period is tolled where an individual voluntarily resigns an interim job without good cause); Bales, 914 F.2d at 94 (finding that the period could be tolled by a showing that the employer would have terminated the worker because it ceased operations at his location at an interim date); Ferguson Elec., 242 F.3d at 431 (noting that the period may be shortened by a showing that the salt accepted a promotion from the Union during the back pay period which removed him from the field); Hoffman Plastic Compounds, Inc. v. NLRB, 208 F.3d 229, 242 (D.C.Cir.2000) (upholding a back pay period that tolled when an employer learned of a worker's undocumented status, requiring his termination). Other possible evidence includes testimony by the salt or his Union managers about the length of time they intended him to work at the target employer.
 
 
 40
 Even if this court would reach a different conclusion on the evidence, it should not interfere with the Board's decision. The Board's choice of a method for calculating back pay concerns a matter uniquely within the Board's competence, and should be given a "wide berth" by this court. Pepsi Cola Bottling Co., 258 F.3d at 314. It should not be disturbed unless it is explicitly punitive. Id.
 
 
 41
 I disagree with the majority's contention that the instant award is punitive. When, as here, an employer's wrongdoing violates the purpose of the NLRA, the Board has broad discretion to craft a remedy that will remove the consequences of such violation. Local 60 v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). A back pay remedy taking into account the entire period of unlawful behavior is appropriate, and not punitive. See, e.g., G. Heileman Brewing Co., Inc. v. NLRB, 879 F.2d 1526, 1534 (7th Cir.1989) (approving an award that required the employer to rehire electricians with full back pay, even though the contract governing the workers had expired, because the employer had wrongfully refused to bargain for a new contract).
 
 
 42
 The majority relies on Pepsi Cola Bottling Co., 258 F.3d 305, to hold that the remedy in this case was punitive. In Pepsi, the Board violated its duty to choose the "most accurate" formula for calculating back pay and instead chose one that it acknowledged would greatly overcompensate the employee, despite the existence of a more accurate formula. Choosing the less accurate formula was sufficiently redolent of punishment to cause the court to remand the matter to the Board for an explanation of how such a remedy could be non-punitive. In this case, the Board merely calculated back pay based on a legal presumption which was not rebutted. Basing a calculation on a proper legal standard should not be equated with purposefully choosing an inaccurate formula.
 
 
 43
 I would defer to the Board's chosen remedy. Aneco has not met its legal burden; the back pay award is the result of the application of a legal presumption; the Board's findings that Aneco did not meet its burden are supported by substantial evidence; and it is inappropriate for this court to substitute its own judgment for that of the Board. Accordingly, I respectfully dissent.
 
 
 
 Notes:
 
 
 *
 However, I note that the record does not support the majority's characterization of Cox's occasional practice of seeking employment with other electricians as unreasonable